The State v. Walker.

THE STATE OF KANSAS v. E. C. WALKER, *et al.*

1. COMMON-LAW MARRIAGE, *When Sustained.* The mutual present assent to immediate marriage by persons capable of assuming that relation is sufficient to constitute marriage at common law; and such a marriage will be sustained in this state, where its validity is directly drawn in question.

2. MARRIAGE, *Legislature May Regulate.* The legislature has full power, not to prohibit, but to prescribe reasonable regulations relating to marriage, and a provision prescribing penalties against those who solemnize or contract marriage contrary to statutory command is within legislative authority.

3. ———— *Disobeying Statute; Punishment.* Punishment may be inflicted upon those who enter the marriage relation in disregard of the prescribed statutory requirements, without rendering the marriage itself void.

4. ———— *Disobedience of Statute, a Misdemeanor.* Under §12 of the marriage act, all persons who enter the marriage relation and live together as husband and wife without complying with the conditions and regulations of the act are guilty of a misdemeanor, and subject to the punishment imposed by that section.

*Appeal from Jefferson District Court.*

E. C. WALKER AND LILLIAN HARMAN were prosecuted in the district court of Jefferson county for a violation of §12 of the marriage act, which reads as follows:

"That any persons living together as man and wife within this state, without being married, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than five hundred nor more than one thousand dollars, or be imprisoned in the county jail not less than thirty days nor more than three months." (Comp. Laws of 1879, ch. 61, §12.)

At the trial, which was had with a jury at the October Term, 1886, Moses Harman, the father of Lillian Harman, testified that on September 19, 1886, his daughter Lillian and E. C. Walker entered into what he called an "autonomistic marriage," at his home, in the presence of himself and two other persons. On that occasion, a statement concerning

the compact or union about to be entered into was read by the witness; then followed a statement made by E. C. Walker, which was responded to by Lillian Harman, and the ceremony was terminated by another short statement from the witness. These statements were published in the *Lucifer*, a newspaper edited by the witness, and the account there given was read in evidence, and is as follows:

### "AUTONOMISTIC MARRIAGE PRACTICALIZED.

"While distinctly denying the right of any citizen or citizens, whether minority or majority, to inquire into our private affairs, or to dictate to us as to the manner in which we shall discharge our private duties and obligations to each other, we wish it understood that we are not afraid nor ashamed to let the world know the nature of the civil compact entered into between Lillian Harman and Edwin C. Walker, at the home of the senior editor of *Lucifer*, on Sunday, the 19th of September, 1886, of the common calendar. As our answer, then, to the many questions in regard thereto, we have reproduced as near as possible the aforesaid proceedings.

I.

"M. Harman, father of Lillian Harman, one of the parties to this agreement or compact, read the following as a general statement of principles in regard to marriage:

"'Marriage — by which term we mean the various attractions, sentiments, arrangements and interests, psychical, social, material, involved in the sex-relations of men and women — is, or should be, distinctively a personal matter, a strictly private affair. There are, or should be, but two parties to this arrangement or compact — a man and a woman ; or perhaps we should say a woman and a man — since the interests, the fate, of woman is involved, for weal or woe, in marriage, to a far greater extent than is the fate or interests of man. Some one has said, 'Marriage is for man only an episode, while for woman it is the epic of her life.' Hence it would seem right and proper that, in all arrangements pertaining to marriage, woman should have the first voice or control. Marriage looks to maternity, motherhood, as its most important result or outcome, and as Dame Nature has placed the burden of maternity upon woman, it would seem that marriage should be emphatically and distinctively woman's work — woman's institution.

"'It need not be said that this is not the common, the popular, and especially the legal, view of marriage. The very etymology itself of the word tells a very different story. Marriage is derived from the French word *mari*, meaning the 'husband,' and never did the etymology of a word more truly indicate its popular and legal meaning than does the etymology of this one. Marriage, as enforced in so-called Christian lands, as well as in most heathen countries, is preëminently man's affair — man's institution. Its origin (mythologic origin) declares that woman was made for man, not man for woman, not each for the other. History shows that man has ruled over woman as mythology declares

Statement of the Case.

he should do, and the marriage laws themselves show that they were made by man for man's benefit, not for woman's. Marriage means or results in the family as an institution, and the laws and customs pertaining thereto make man the head and autocrat of the family. When a woman marries, she merges her individuality as a legal person into that of her husband, even to the surrender of her name, just as chattel slaves were required to take the name of their master.

"'Against all such invasive laws and unjust discriminations, we, as autonomists, hereby most solemnly protest. We most distinctly and positively reject, repudiate and abjure all such laws and regulations, and if we ever have acknowledged allegiance to these statute laws regulating marriage, we hereby renounce and disclaim all such allegiance.

"'To particularize and recapitulate: Marriage, being a strictly personal matter, we deny the right of society, in the form of church and state, to regulate it, or interfere with the individual man and woman in this relation. All such interference, from our standpoint, is regarded as an impertinence, and worse than an impertinence. To acknowledge the right of the state to dictate to us in these matters is to acknowledge ourselves the children or minor wards of the state, not capable of transacting our own business. We therefore most solemnly and earnestly repudiate, abjure and reject the authority, the rites and ceremonies of church and state in marriage, as we reject the mummeries of the church in the ceremony called baptism and at the bedside of the dying. The priest, or other state official, can no more prepare the contracting parties for the duties of marriage than he can prepare the dying for life in another world. In either case the preparation must be the work of the parties immediately concerned. We regard all such attempts at regulation on the part of church and state as not only an impertinence, not only wrong in principle, but disastrous to the last degree in practice. Here, as everywhere else in the realm of personal rights and reciprocal duties, we regard intelligent choice—untrammeled voluntaryism—coupled with responsibility to natural law for our acts, as the true and only basis of morality.

"'As a matter of principle we are opposed to the making of promises on occasions like this. The promise to 'love and honor' may become quite impossible of fulfillment, and that from no fault of the party making such promise. The promise to 'love, honor and obey so long as both shall live,' commonly exacted of woman, we regard as a highly immoral promise. It makes woman the inferior, the vassal of her husband, and when from any cause love ceases to exist between the parties this promise binds her to do an immoral act, viz.: it binds her to prostitute her sex-hood at the command of an unloving and unlovable husband.

"'For these and other reasons that will readily suggest themselves, we, as autonomists, prefer not to make any promises of the kind usually made as part of marriage ceremonies.'

## II.

"E. C. Walker, as one of the contracting parties, made the following statement:

"'This is a time for clear, frank statement. While regarding all public marital ceremonies as essentially and ineradicably indelicate, a pandering to the morbid, vicious, and meddlesome element in human nature, I consider this form least objectionable: I abdicate in advance all the so-called 'marital rights' with which this public acknowledgment of our relationship may invest me. Lillian is, and will continue to be, as free to repulse any and all advances of mine as she has been hereto-

fore. In joining with me in this love and labor union, she has not alienated a single natural right. She remains sovereign of herself,. as I of myself, and we severally and together repudiate all powers legally conferred upon husbands and wives. In legal marriage, woman surrenders herself to the law and to her husband, and becomes a vassal. Here, it is different; Lillian is now made free.

"'In brief, and in addition: I cheerfully and distinctly recognize this woman's right to the control of her own person; her right and duty to retain her own name; her right to the possession of all property inherited, earned, or otherwise justly gained by her; her equality with me in this copartnership; my responsibility to her as regards the care of offspring, if any, and her paramount right to the custody thereof, should any unfortunate fate dissolve this union. And now, friends, a few words especially to you: This wholly private compact is here announced, not because I recognize that you, or society at large, or the state, have any right to inquire into or determine our relations to each other, but simply as a guarantee to Lillian of my good faith toward her. And to this I pledge my honor.'

III.

"Lillian Harman then responded as follows:

"'I do not care to say much; actions speak more clearly than words, often. I enter into this union with Mr. Walker of my own free will and choice, and I agree with the views of my father and of Mr. Walker as just expressed. I make no promises that it may become impossible or immoral for me to fulfill, but retain the right to act always as my conscience and best judgment shall dictate. I retain, also, my full maiden name, as I am sure it is my duty to do. With this understanding I give to him my hand in token of my trust in him and of the fidelity to truth and honor of my intentions toward him.'

"Then M. Harman said:

"'As the father and natural guardian of Lillian Harman, I hereby give my consent to this union. I do not 'give away the bride,' as I wish her to be always the owner of her person, and to be free always to act according to her truest and purest impulses, and as her highest judgment may dictate.'"

It was expressly admitted that no license for the marriage of the defendants had been obtained, and that no marriage ceremony was performed by any judge, justice of the peace, or licensed preacher of the gospel, and that neither of the defendants belonged to the Society of Friends or Quakers. The proceedings mentioned were followed by the matrimonial cohabitation of the defendants. Upon this testimony the jury returned a verdict of guilty. Motions in arrest of judgment and for a new trial were filed and overruled, and the judgment of the court was that the defendant, *E. C. Walker*, be confined in the county jail for a period of seventy-five days, and the defendant, *Lillian Harman*, for a period of forty-five days, and that the defendants pay the costs of the action and

stand committed to the jail of the county until payment is made.    The defendants appeal.

*G. C. Clemens,* and *David Overmyer,* for appellants.

*W. F. Gilluly,* county attorney, and *S. B. Bradford,* attorney general, for The State.

The opinion of the court was delivered by

JOHNSTON, J.: The questions to be determined upon this appeal arise upon an instruction given to the jury upon the trial, in which it was said that—

"If the defendants, at the time alleged in the information, and in this state, agreed to live together as husband and wife without having a license to be married, and without having a marriage solemnized by a judge, justice of the peace, or licensed minister of the gospel, and in pursuance of such agreement lived together in this county, they would be guilty of the offense charged in the information."

The instruction is founded upon the marriage act, and the manifest theory of the court is that the law of Kansas has provided rules regulating the marriage contract, and has prescribed a penalty or punishment for those who live together as man and wife without observing its requirements.    In behalf of the appellants it is urged that what was said and done by them was sufficient to constitute marriage at common law. It is claimed that the formalities prescribed by statute are not essential to the validity of the marriage, and that as the contract of marriage between the defendants was not void, they are not punishable for failing to observe the statutory requirements in entering into the marriage contract, and that therefore the instruction given is erroneous.    The correctness of the instruction depends upon the proper interpretation of the marriage act.    The first section of the act provides that a marriage contract shall be considered in law as a civil contract, to which the consent of the parties is essential, and that the ceremony may be regarded either as a civil ceremony, or as a religious sacrament; but it provides that "the marriage relation shall only be entered into, maintained, or abrogated as

provided by law." The second section provides that certain degrees of consanguinity shall be an impediment to marriage, and all marriages within the forbidden degrees of consanguinity are declared to be incestuous and void. The third section declares that all persons who contract, license, or solemnize an incestuous marriage shall be guilty of a misdemeanor and subject to fine and imprisonment. The fourth section declares a penalty against any person who shall join others in marriage before a license has been issued by the probate judge. The fifth section provides that the probate judge shall issue a license to all persons legally entitled to the same upon application, and prescribes the form of the license. In the sixth section the probate judge is required to make a record of the licenses issued by him, as well as of the return indorsed upon the license by the person performing the marriage ceremony, and states the fee to which he is entitled. The seventh section visits a penalty upon the probate judge who refuses or neglects to issue a license to a person legally entitled thereto when application is made, or who neglects to make a record of the license issued, or the return indorsed thereon. The eighth section empowers the probate judge to administer oaths and examine witnesses with reference to the right of persons who apply to him for license to assume the marriage relation, and also prescribes a penalty for issuing a license to persons not legally entitled thereto. The ninth section provides that marriages contracted outside of this state, and which are valid where contracted, shall be deemed valid in this state. The tenth section provides that every judge, justice of the peace, or licensed preacher of the gospel, may perform the marriage ceremony in this state, and shall certify on the back of the license the fact of the marriage and the date thereof, and cause the license to be returned to the probate judge within thirty days. To that section is added a proviso that marriages solemnized among the Society of Friends or Quakers in accordance with their forms and usage shall be good and valid, and shall not be affected by the provisions of the marriage act. The eleventh section provides that the books of record of

marriage licenses, and the entries therein certified to by the probate judge, under his official seal, shall be evidence in all courts. The twelfth section, and the one under which this prosecution is brought, provides that "any persons living together as man and wife within this state, without being married, shall be deemed guilty of a misdemeanor," etc. And the thirteenth section provides that all records heretofore kept relating to marriages shall be delivered to the probate judge in the county within thirty days after the taking effect of the act.

It is palpable that the leading idea and purpose of this act is to compel publicity, and to require a record to be made of the marriages contracted in Kansas. By the terms of the act, marriage is declared to be a civil contract, the essential feature of which is the consent of the parties. No particular ceremony or form of solemnization is prescribed or required. The settled doctrine of the law to be applied in a case where the validity of a marriage is drawn in question, is, that in the absence of all civil or statutory regulations, the mutual present assent to immediate marriage by persons capable of assuming that relation, is sufficient without any formal solemnization. Such a contract constitutes a marriage at common law, and its validity will be sustained, unless some statute expressly declares it to be void. (*Meister v. Moore,* 96 U. S. 76; 1 Bish. Mar. & Div., §§ 279, 280, 283, *et seq.,* and numerous cases there cited.) It may also be conceded to be well established that marriage, being a natural right and existing before the statutes, is favored by the law, and that all statutory regulations, if the language will permit, are to be construed as merely directory. "The doctrine has become established in authority, that a marriage good at the common law is good notwithstanding the existence of any statute on the subject, unless the statute contains express words of nullity." (1 Bish. Mar. & Div., § 283.) It is also true that according to the terms of the marriage act, the only marriage contracts declared to be void are those entered into between persons closely allied in blood, which are

1. Common-law marriage; when sustained.

everywhere prohibited.   No such relationship existed between the defendants; nor is it shown that there was any impediment to their marriage.   The penalties inflicted by other provisions of the statute upon officers and those who fail to observe the required formalities, do not necessarily render a consensual marriage void; but this does not meet the charge against the defendants, nor render erroneous the instruction of the court.   If the question involved in the case was, whether the marriage was void or voidable, or if the legitimacy of children were in question, the argument of the defendants would be more applicable; and yet we are not prepared to say that the contract between the defendants is a common-law marriage.   The question actually presented is, whether the legislature intended to inflict punishment on those who entered the marriage relation without observing the statutory regulations.   The legislature has full power, not to prohibit, but to prescribe reasonable regulations relating to marriage, and a provision making it an offense and punishing those who solemnize or contract marriage contrary to statutory command, is within the legislative authority.   Punishment may be inflicted on those who enter the marriage relation in disregard of the prescribed statutory conditions, without rendering the marriage itself void.   In *Teter v. Teter*, 101 Ind. 129, the supreme court of Indiana, while holding that ceremonial rites are not indispensable, and that the intention to assume the relation of husband and wife, attended by pure and just motives, and accompanied by an open acknowledgment of that relation, is sufficient to constitute marriage, stated that—

2. Marriage, legislature may regulate.

3. Disobeying statute; punishment.

"Persons may be punished for not obtaining licenses to marry, or for not taking steps to secure a proper record· of the marriage, but there may nevertheless be a valid marriage."

Mr. Bishop says that—

"This rule seems not to be peculiar to the common law. It exists also in Sicily; so in Scotland, where marriages contrary to the forms established by law are very frequent, and

no question remains as to their validity, the law imposes severe penalties upon the parties, the celebrator and the witnesses." (1 Bish. Mar. & Div., § 287.)

This, in our opinion, is the legislative purpose and expression in enacting § 12 of the marriage act. The provision imposing a penalty upon those who live together as man and wife without being married is a part of the marriage act, wherein it is provided how marriage contracts may be entered into and solemnized. In the first section of the act it is provided that the marriage relation shall only be entered into in the manner provided by law. It proceeds to state what the manner is, and then prescribes penalties that are to be visited on all who disregard the rules laid down.

It is to be observed that the law relating to marriage was changed in 1867, at which time the words were added to the first section that "The marriage relation shall only be entered into, maintained, or abrogated, as provided by law." At the same time, the twelfth section was added, providing the punishment which the defendants are now seeking to escape. These changes were not idly made, but were manifestly intended to compel compliance with the formalities and conditions prescribed. It is evident from the penalties imposed, that the legislature deemed the enforcement of the statutory regulations as important and beneficial, not only to the parties contracting marriage, but to society at large as well. The probate judge is to be punished if he issues a license to those not entitled to one. Magistrates and ministers of the gospel are forbidden under heavy penalties to marry persons before a license has been obtained; and the probate judge is declared guilty of an offense if he fails to properly record the license and the return thereon. By these and other penalties, the legislature undertook to prevent the officers and ministers from authorizing or solemnizing marriages where the conditions and formalities of the statute have not been observed. The same idea is further carried out in the twelfth section, by visiting a punishment upon the parties themselves for failing to conform to the rules prescribed. The legislature directs how parties may be mar-

20 — 36 KAS.

ried, and then declares a punishment against them for living together as man and wife without being married, as the law provides. It is true that the penalty is directed against those who live together as man and wife "without being married." These words, we think, refer to those who assume the marriage relation without being married in the manner and upon the conditions in accordance with which the legislature has declared marriage should be contracted. When persons who are permitted to marry "live together as man and wife," it may be taken as an expression of consent, and consent under these circumstances is sufficient, as we have seen, to constitute a marriage at common law. It was certainly not intended that persons guilty of bigamy or adultery, nor persons who intermarry or cohabit with each other that are within the forbidden degrees of consanguinity, nor yet that a man or woman (one or both of whom are married) who shall abide or cohabit with each other, should be prosecuted and punished under this provision, as those offenses are defined and the punishment declared in the crimes act. (Gen. Stat., ch. 31, art. 7.) Under that act severe punishment is measured out to those who marry or live together as man and wife where there is a legal impediment to their marriage. For these offenses there is a maximum punishment prescribed of from five to seven years' imprisonment, while a conviction under the provision of the marriage act which we are considering, subjects the parties to a mere fine, or to imprisonment in the county jail not more than three months.

The exception made by the statute in regard to marriages solemnized among the Society of Friends or Quakers lends support to the view which we have taken. Marriage with them is based on consent publicly declared in one of their meetings, and has all the elements necessary to make it good at common law. According to the defendants' theory, they would not be liable to the penalty written in §12, because marriage celebrated in accordance with their usage is valid at common law. But to relieve them from complying with the formalities of the statute, and to exempt them from the pen-

alty provided, the legislature deemed it necessary to except their informal marriages from the operation of the act.

The argument made, that to require an observance of the statutory regulations trenches upon the liberty of conscience guaranteed by the constitution, is not sound. Although marriage is generally solemnized with some religious ceremony, it is not under the control of ecclesiastical or religious authority. No religious rite or ceremony is prescribed. The intervention of a preacher or priest is not essential, and no religious qualification is required. So careful was the legislature to guard against any such invasion, that no particular form of ceremony is prescribed; and in the first section of the act it is declared that the ceremony may be regarded either as a civil ceremony or as a religious sacrament. The regulations prescribed are neither burdensome nor unreasonable. These parties may go before a probate judge and obtain a license for a nominal fee, and there, in his presence, and without further rite or ceremony, perfect the marriage by declaring that they take each other for man and wife. The so-called "mummeries of the church," against which the defendants so strenuously object and protest, may be wholly omitted, and they may be married in as plain and matter-of-fact manner and with as short and simple a ceremony as can be desired, by a justice of the peace or other magistrate. It cannot be doubted that the purpose of the statutory regulations is wise and salutary. They give publicity to a contract which is of deep concern to the public, discourage deception and seduction, prevent illicit intercourse under the guise of matrimony, relieve from doubt the *status* of parties who live together as man and wife, and the record required to be made furnishes evidence of the *status* and legitimacy of their offspring. In the accomplishment of this purpose it was just as necessary to provide a penalty against parties who contract marriage in disregard of the rules prescribed, as against officers and ministers, who only perform a minor part in the proceedings; and we have no doubt that this was the legislative intention in the enactment of § 12 of the marriage act. We see no reason

4. Disobedience of statute, a misdemeanor.

to declare the act invalid; and finding no error in the record, we must affirm the judgment of the district court.

HORTON, C. J., concurring: Upon the record as presented to us, the question in my opinion for consideration is, not whether Edwin C. Walker and Lillian Harman are married, but whether in marrying, or rather in living together as man and wife, they have observed the statutory requirements. The language of the statute is: "The marriage relation shall only be entered into, maintained or abrogated as provided by law;" and "Any persons living together as man and wife within this state, without being married, shall be deemed guilty of a misdemeanor." (Comp. Laws of 1879, ch. 61, §12.)  My construction of these provisions is, that a ceremonial marriage must be celebrated in conformity therewith, and that any persons living together as man and wife, without being married according to these directions, are liable to the penalty thereof. I do not say, nor do I intend to intimate, that a "consensual marriage" is not valid; but the legislature has the right to require parties assuming the marriage relation to have the marriage entered into publicly, and a record made of the same. This I think is the purpose of the statutory regulations.

Whatever commands the state may give respecting a formal marriage, the courts usually hold a marriage at common law to be good, notwithstanding the statute, unless it contains express words of nullity; yet persons who marry without conforming to the statutory regulations may be punished, although the marriage itself be valid.   The consequences of marriage as to conjugal rights and the rights of heirs are so momentous that the interests of society may properly require a witness to the marriage, and a record of its acknowledgment; this much is required in the acknowledgment and registration of an ordinary conveyance of real estate.   If there be no registration, no officiator, and no eye-witness of the marriage, the woman is placed at the mercy of the man, who may deny the "consensual relation" and repudiate her; and on the other hand a man may be blackmailed by an adventuress, who may de-

clare there was a "consensual marriage" when there was none; therefore the statute requiring the registration and acknowledgment of marriage is for the benefit of the parties, as well as their heirs. No man who desires in good faith to make a woman his wife will object to obtaining a marriage license, going before some person authorized to perform the marriage ceremony, and acknowledging the marriage. The fees for a marriage license and its return are only two dollars. The acknowledgment of the marriage relation may be made for a trifling sum, unless the parties voluntarily donate a liberal fee.

As a rule, I do not think that any woman who has reached the years of discretion, and has a full appreciation of the marriage relation, will demur when it is proposed to clothe her matrimonial association with the forms of law. If the man objects to having his marriage public, he tacitly admits that he intends to cheat her whom he has privately promised to make his wife. It is only just that the acknowledgment and registration of the marriage relation should not be left to the whim and caprice of the parties, because no transaction in the life of a man or a woman is more important, or fraught with more significant consequences; and society is supremely interested in having a marriage entered into publicly, and to have a record thereof.

But counsel claim that Edwin C. Walker and Lillian Harman should not be imprisoned on account of their non-observance of the statutory provisions regarding marriage, upon the ground that the statute "is an interference with their conscience," and therefore unconstitutional. (Bill of Rights, § 7.) The assertion that the acknowledgment and registration of a marriage conflicts with any right of conscience, is wholly without foundation. The provisions of the act relating to marriage no more infringe the state constitution than does the law regulating the acknowledgment and registration of real-estate conveyances, chattel mortgages, etc.; in fact, but little more ceremony is required for the one than for the other. The statute does not demand that the marriage ceremony shall

be regarded as a religious sacrament; no recognition of the
pope, or the church of Rome, or any minister, priest, church,
religion, or superstition, is required; no intervention of a
person in "holy orders" is requisite.   The marriage does not
have to be celebrated in any church, chapel, or other religious
or public edifice.   A probate judge or a justice of the peace
may solemnize the marriage, and this may be done at the home
of the parties, in the office of the official, or any other place
the parties may select.   The ceremony, if the parties so de-
sire, may consist in the simple presentation to the official of
the marriage license and a request that he take cognizance of
the mutual engagement of the parties to assume the marriage
relation.   No special form or solemnization is prescribed or
demanded.

Instead of permitting the man, as in olden times, to go to
the house where his betrothed resides, and lead her away to
his own house, and call her his wife, and live with her as his
wife, the statute requires the man and wife, if they are to live
together in the marriage relation, to obtain a license at the
office of the probate judge, and have their mutual engagement
acknowledged before some authorized person.   The license
after the marriage is to be returned to the office of the probate
judge, and the registration thereof becomes public.   If the
parties in this case preferred to enter into the marriage rela-
tion without any religious or other elaborate ceremony, they
could have done so within the terms of the statute, by obtain-
ing a license and going quietly before some justice of the
peace, and had their marriage relation there witnessed and
acknowledged.   They might have had as much ceremony, or
as little, as they chose.

I cannot understand how the provisions of the statute can
be truthfully denounced a "monstrosity," or in what way the
"sacred liberty" or "the personal rights" of the parties are
infringed.   If Lillian Harman desires to retain her own name,
I can perceive no objection to her doing so.   There is noth-
ing in the statute justifying a man in being guilty of cruelty,

or other inhuman or brutal conduct, toward his wife, and the wife does not merge her individuality as a legal person in that of her husband.

The constitution and statutes of Kansas are very liberal in recognizing the rights and privileges of women. Marriage involves neither the assumption of indebtedness nor the acquisition of property; a married woman may contract and be contracted with concerning her separate real and personal property, sell, convey, and incumber the same; sue and be sued with reference thereto, in the same manner, and to the same extent, and with like effect, and as freely as any other person may in regard to his or her real or personal property. She may purchase personal property from her husband, perform labor and services on her sole and separate account, and make the earnings therefrom her sole and separate property; she has the same control of her person and property as her husband; she has the same rights as to the nurture, education and control of her children, and also the same rights in the possession of the homestead. (*Knaggs v. Mastin*, 9 Kas. 532; *Tullman v. Jones*, 13 id. 438; *Going v. Orns*, 8 id. 85; *Larimer v. Kelley*, 10 id. 298; *Butler v. Butler*, 21 id. 526.) She may participate in all city elections, attend caucuses, nominate candidates, and vote for such persons and principles as her judgment dictates. In fact, in Kansas a woman is in nearly all matters accorded civil and political equality with man; she is not his servant nor his slave. Here, the sexes may harmonize in opinion, and coöperate in effort; here, woman is no longer subordinate to man, but the two are coördinate together; here, the burden of a common prejudice and a common ignorance against woman has been wholly removed; here, the tyranny which degrades and crushes the wives and mothers in other countries, no longer exists; here, the coveted rewards of life forever forbidden them in some of the states, are within their reach; here, a fair field for their genius and industry is open, and womanhood, with the approbation of all, may assert its divinely-chartered rights, and fulfill its noblest duties.

If Edwin C. Walker and Lillian Harman are suffering im-

prisonment, it is because they have willfully and obstinately refused to conform to the simple and inexpensive regulations of the statute directing marriage. In their non-observance of these regulations they have exhibited neither good sense nor sound reason. For purposely and publicly defying the law enacted for their benefit and the benefit of their offspring, if they shall have any, they are now punished; and if they persist in the future in living together as man and wife without complying with the statute, they deserve, and undoubtedly will receive, further punishment, if criminal proceedings be instituted against them. They can at any time easily procure a license to marry, go before an officer and acknowledge their marriage; and then they will become, within all of the terms of the statute, husband and wife. Then over their union there can be no contention. Then the wife may be to the husband, in law and in deed,

> "A guardian angel o'er his life presiding,
> Doubling his pleasures, and his cares dividing."

VALENTINE, J..: I concur in the judgment of affirmance. I do not believe that E. C. Walker and Lillian Harman were married in any sense. In my opinion, their lengthy and prolix ceremony at the time of forming their questionable union did not meet the necessary requirements of the law, either statutory or common, to establish a valid marriage. It is true, where a license is obtained and the parties are competent to marry each other, a bare acknowledgment before a judge, a justice of the peace, or a licensed preacher of the gospel, that they in the present assume the marriage relation, is all that is necessary to constitute a valid marriage. But none of these things were done in the present case. I shall also assume that aside from the statutes, but in accordance with the common law, a valid consensual marriage may be created in Kansas. In other words, the mere living together as husband and wife of a man and a woman competent to marry each other, with the honest intention of being husband and wife so long as they both shall live, will constitute them husband and wife

and create a valid marriage. But that is not this case. In the present case, the parties repudiated nearly everything essential to a valid marriage, and openly avowed this repudiation at the commencement of their union. They avowed, among other things, that they would not be governed by the laws of the state or of society upon this subject, but would be governed only by their own notions of right and propriety. They announced in effect that they "repudiated all powers legally conferred upon husbands and wives," and that they "are opposed to the making of promises," and that both were to remain free, as before their union; and they did not make the necessary and essential promises to constitute them husband and wife. Walker, as a part of the ceremony, said: "I abdicate in advance all the so-called marital rights;" and Lillian Harman agreed with him in all things. After this ceremony, which took place on Sunday, September 19, 1886, and up to their arrest in this case, which took place on Monday, the next day after the ceremony, Walker and Lillian Harman lived together as husband and wife, but without any intention of being such in legal contemplation. That is, they lived together, but had no intention of creating that relation or *status* known and defined by law and by the customs and usages of all civilized society as marriage. This living together under such circumstances did not in law constitute a valid marriage. If they had lived together for years, and until they had had children, and until one of them had died, it might then, in the interest of the innocent children, and notwithstanding the perverseness and waywardness of their parents, be assumed and held that the parents had changed their first unlawful intentions, and had converted what would have continued to be an unlawful union into a legal and valid marriage. Much more might be said with reference to this question, but I think this is sufficient. In my opinion, the union between E. C. Walker and Lillian Harman was no marriage, and they deserve all the punishment which has been inflicted upon them.