No. 34,659

MARY PITNEY, *Appellee,* v. RAYMOND PITNEY, *Appellant.*

(101 P. 2d 933)

Opinion filed May 4, 1940.

*B. C. Pickering, D. C. Hill* and *R. H. Kaul,* all of Wamego, for the appellant.
*C. E. Carroll* and *A. E. Carroll,* both of Alma, for the appellee.

The opinion of the court was delivered by

SMITH, J.: The plaintiff brought this action for alimony and separate maintenance, claiming to be the common-law wife of the defendant. The trial court made findings of fact and gave judgment in plaintiff's favor, and defendant has appealed.

The question presented upon the appeal is whether the findings of the court and the evidence contained in the record support the judgment of the court. The contested issue is whether there was in fact a common-law marriage between plaintiff and defendant. The general situation may be gleaned from the findings of fact made by the court. They are in part as follows:

"1. That in the year 1914, the plaintiff herein, whose name was then Mary Wilson, and who was then a young girl, went to work in the home of Walter Pitney, the father of the defendant, Raymond Pitney, as a domestic. That she continued to work in the home of Walter Pitney at various times from 1914 to 1920; that the family at that time consisted of Walter Pitney and his wife, the defendant, Raymond Pitney, and several minor children of Walter Pitney and wife.

"2. That in the spring of 1920, Walter Pitney and wife, together with all of the family, except the defendant, Raymond Pitney, moved to another farm several miles distant from the farm previously occupied. That the defendant, Raymond Pitney, remained on the farm previously occupied, hereinafter referred to as the Pitney Ranch, and still continues to reside on said farm. That the plaintiff, who is a second cousin of defendant, continued to reside on the Pitney Ranch and to keep house for the defendant.

"5. That during the above-mentioned times the plaintiff was authorized to and did sign the defendant's name to checks drawn on his bank account for the payment of labor, groceries and supplies and other expense necessary for the operation of the farm. Plaintiff borrowed money at the bank in her own name, which was turned over to the defendant and placed in his checking account and used to meet operating expenses, interest and taxes on the farm. Defendant discussed with plaintiff from time to time his business deals, finances and other things in connection with the operation of the farm, and that plaintiff at times expended her own money in purchasing things for the home.

"7. That during all of the above period of time until about July, 1938, defendant took plaintiff with him to town, to various places in the neighborhood, to parties and gatherings in the neighborhood and to the family reunions and gatherings of plaintiff's family, and on one occasion defendant took plaintiff with him to central western Kansas on a business trip, where the plaintiff and defendant stayed all night at a hotel in Abilene, Kan., under the name of Ray Pitney and wife. That defendant gave plaintiff presents during the above period at Christmas and at other times.

"8. That during the above period of time plaintiff retained her former name of Mary Wilson, although the evidence discloses that in July, 1938, at the instance and request of the defendant, Raymond Pitney, and for the purpose of obtaining credit, the plaintiff signed an agreement to pay to the International Harvester Company by signing the name, Ray Pitney, by Mrs. Ray Pitney. The evidence further discloses that on two different occasions the plaintiff cashed insurance policies which she carried upon her life and that the money received therefrom was placed in the bank account of Ray-

mond Pitney and used to pay interest and taxes and operating expenses on the Pitney Ranch.

"10. The evidence is conflicting upon the relationship of plaintiff and defendant during the above period of time; however, the court finds that since April, 1920, until plaintiff left the home of the defendant, that plaintiff and defendant resided together in the house on the Pitney Ranch, as man and wife, enjoying all the privileges of such relationship, and that on many occasions the defendant promised plaintiff orally that he would go through a marriage ceremony with plaintiff to make their union look right to the neighbors; however, no such ceremony was ever solemnized."

The defendant attacks finding No. 10 as made by the court, contending that the evidence does not show that the status of marriage existed between the parties. He also argues that the finding itself is insufficient upon which to base a conclusion that a common-law marriage existed.

The testimony of the plaintiff herself was the only evidence of an express marriage agreement between the parties. That testimony was:

Q. You will please state what he said. A. He said he would marry me if I would have sexual intercourse with him.

"Q. Did you have sexual intercourse with him at that time? A. Yes. The latter part of April, 1920."

On cross-examination she testified:

"Q. Where were you when you entered into this conversation? A. In the home.

Q. Please answer the question. A. He wanted intercourse and I told him he would have to marry me first.

Q. Tell what he said. A. That is what he said to me.

Q. And that was all he said? A. I cannot remember everything that was said that far back.

"Q. What day was that on? A. I could not call the date.

"Q. How do you recall it? A. There are things like that you remember.

"Q. What did you say to him, after he wanted intercourse? A. I told him he should marry me first.

"Q. What did he say? A. Said he would that summer.

"Q. He has not since then up to this time? A. No."

Some further testimony appears in the counter abstract:

Q. Was anything said by the defendant or yourself about your status as to being married? A. He said we had lived together as man and wife and he did not care who knew it.

"Q. He stated to you, you were man and wife, and he did not care who knew it. A. Yes.

"Q. When was that? A. In the spring of 1920.

"Q. Any other times? A. Yes, he made that remark several times during the years."

The plaintiff also introduced some ten witnesses who testified that from observing the parties the witness was of the opinion that they were married. But each of these witnesses testified that neither of the parties had ever said that they were married, or held themselves out as man and wife. As found by the court, plaintiff went by her maiden name. There is evidence also as found by the trial court that the parties once spent the night together at a hotel in Abilene after registering as "Ray Pitney and wife"; also, that in July, 1938, plaintiff signed an agreement to buy a piece of farm machinery with defendant's consent, signing "Ray Pitney, by Mrs. Ray Pitney."

Is the above evidence sufficient to support the judgment of the court and was the demurrer of the defendant filed thereto correctly overruled?

Much of the evidence introduced by defendant was contrary to the evidence detailed above. Other evidence was introduced which would tend to show that no marriage existed, but under the well-known rules of appellate procedure that will not be considered in determining whether the demurrer was properly overruled.

We shall examine the entire record to ascertain whether there was substantial evidence to sustain the judgment.

In 18 R. C. L. 391, § 12, it is said:

"The two essentials of a valid marriage at common law are capacity and mutual consent, and it is well settled that under the common law the marriage relation may be formed by words of present assent, *per verba de praesenti*, . . ."

Again in 18 R. C. L. 392 it is said:

"To constitute a valid marriage *per verba de praesenti* there must be an agreement to become husband and wife immediately from the time when the mutual consent is given. An express future condition is absolutely fatal to a claim of marriage, and cannot be explained away by circumstances. It shows mental reservations which are incompatible with consent. This is true whether the condition relates to the creation of the marriage status, or to the duration of the relations of the parties. As there can be no contract *per verba de praesenti* where the marital status is to become fixed in the future, it is not sufficient to agree to present cohabitation and a future regular marriage when more convenient, or when a wife dies, or when a ceremony can be performed."

See, also, 18 R. C. L. 393 as to marriage *de futuro cum copula,* and 38 C. J. 1298, §§ 52 to 58, inclusive.

Plaintiff's testimony taken as a whole can only reasonably be taken to show that the parties cohabited together upon the promise of the defendant to marry plaintiff in the future—"that summer."

Moreover, there is no evidence that the parties held themselves out as man and wife. There was evidence of opinion or speculation by certain witnesses that they might be. This falls short of that reputation and open conduct upon which an agreement of common-law marriage may be inferred.

In *Butler v. Butler,* 130 Kan. 186, 285 Pac. 628, the facts bore some similarity to the facts in this case. True, there the trial court had failed to find a marriage and that judgment was affirmed, but in that case both the man and woman agreed there had been a common-law marriage, but this court held the trial court correct in holding that the lack of any open recognition of the status prevented the parties from establishing the marriage.

Of course, cohabitation and repute are only evidence of marriage, but plaintiff's case shows no evidence of holding out to the public as husband and wife to strengthen plaintiff's contention that a marriage existed.

See 18 R. C. L. 430, 433, §§ 58, 59, 62.

Plaintiff herself testified:

"Q. Did you tell anyone that you were husband and wife? A. I can't say as I did.

. . . . . . . . . . . . . . . .

"Q. You cannot remember anyone you ever told that to? A. No."

As found by the court in finding No. 11 defendant began keeping company with Frances Rowles in July, 1938. Plaintiff testified Frances Rowles came to the ranch and asked for defendant on different occasions and that plaintiff knew defendant was keeping company with Frances Rowles. Plaintiff further testified:

"Q. Did you at any time tell her you were Ray's common-law wife? A. Did not (know) as I was supposed to.

"Q. Will you answer yes or no? A. No.

"Q. You never at any time told her you claimed to be Ray's common-law wife? A. No. Did not know I had to tell her."

It appears from plaintiff's testimony that plaintiff was present when defendant brought his new wife home on November 15, 1938; that plaintiff left at the request of Mrs. Pitney on November 16,

without making any claim that she herself was the wife of the defendant.

In the case of *Shorten v. Judd,* 60 Kan. 73, 55 Pac. 286, it was said:

"Nothing in our statutes prohibits a marriage *per verba de praesenti,* or at common law, and so it has been held that where there are no impediments existing a present consent between parties then to take each other as husband and wife, followed by cohabitation, is sufficient to constitute a valid marriage. . . . There is the testimony of Sadie Runkle that there was a present consent to an immediate marriage, and that they lived together as husband and wife from that time until the death of Judd. . . . If the facts as written in the record were submitted to the writer he would hesitate long before he would hold that there was an actual marriage, or that the parties themselves understood that they had assumed the marriage relation. Among other things, it would seem that no publicity was given to the alleged marriage; she never told her parents, relatives or friends that she had been married— not even her sister, who lived in the Judd house with her a part of the time." (p. 77.)

One difference between this case and the case of *Shorten v. Judd* is that it does not appear that plaintiff in this case testified that there was a present consent to an immediate marriage.

This court has discussed common-law marriages in the following cases. In each of them a mutual present consent to the marriage was regarded as being essential to the establishment of such a marriage: *Renfrow v. Renfrow,* 60 Kan. 277, 56 Pac. 64; *Matney v. Linn,* 59 Kan. 613, 54 Pac. 668; *State v. Walker,* 36 Kan. 297, 13 Pac. 279; *Schuchart v. Schuchart,* 61 Kan. 597, 60 Pac. 311; *Freeman v. Fowler Packing Co.,* 135 Kan. 378, 11 P. 2d 276; *Jacoby v. Jacoby,* 132 Kan. 77, 294 Pac. 857; and *Cooper v. Cooper,* 147 Kan. 256, 76 P. 2d 867.

See, also, *Haywood v. Nichols,* 99 Kan. 138, 160 Pac. 982; and *Reese v. Reese,* 132 Kan. 438, 295 Pac. 260.

A case which is quite similar to this is *Marsicano v. Marsicano,* 79 Fla. 278, 84 So. 672. The testimony of the woman plaintiff there suing for alimony as to the existence of a common-law marriage and the mutual assent necessary to establish such a marriage is strikingly like the testimony of plaintiff in this case. But in the Marsicano case the parties had publicly recognized each other as husband and wife, a fact which as noted above does not appear in this case, yet the supreme court of Florida concluded:

"This evidence does not establish the relation of a common-law marriage between the parties that can be recognized as such in this state. The testi-

mony not only fails entirely to show a marriage *per verba de praesenti,* but actually negatives it. It may, however, tend to show a relation resembling a so-called marriage *per verba de futuro cum copula;* and to sustain this decree we would have to sanction this class of marriages in Florida. Marriages *per verba de futuro cum copula* have never been recognized in this state. In most of the cases where this doctrine seems to be recognized, there was such a condition of facts as almost to bring them within the doctrine of a marriage *per verba de praesenti.* The ancient doctrine of marriages *per verba de futuro cum copula* is so nearly, if not entirely, repudiated in this country that we will not give effect to it in this state, fraught as it is with such serious consequences to innocent persons who 'might enter into a recognized form of marriage with a person whose prior relations with another partook so nearly of an illicit nature." (p. 289.)

In the case of *Crossett v. The State,* 97 Tex. Crim. Rep. 18, 260 S. W. 186, defendant was prosecuted for seduction. It appeared the defendant had promised marriage at a future date; that the parties had stayed together at a hotel for a week as man and wife. Defendant claimed that the court should have instructed upon the theory of common-law marriage; that such a marriage had existed and that he could not be prosecuted on the charge of seduction. The court held a refusal to so instruct the jury was correct; that there was no evidence of a present agreement to become husband and wife immediately.

See, also, *Catlett v. Chestnut,* 107 Fla. 498, 146 So. 241.

In view of the above authorities plaintiff's evidence does not support the judgment of the trial court and the demurrer of the defendant to plaintiff's evidence should have been sustained.

The judgment of the trial court is reversed with directions to enter judgment for the defendant.