No. 44,432

HAZEL SULLIVAN, *Appellant,* v. CHARLES SULLIVAN, FERN BRANDT, and ESTHER HUTCHINSON, *Appellees.*

(413 P. 2d 988)

Opinion filed May 7, 1966.

D. O. *Concannon,* of Hugoton, argued the cause, and *Arthur B. McKinley,* of Hugoton, was with him on the brief for the appellant.

*Leland E. Nordling,* of Johnson, argued the cause, and *A. E. Kramer* and *B. E. Nordling,* of Hugoton, were with him on the brief for the appellees.

The opinion of the court was delivered by

O'CONNOR, J.: This action was commenced by the plaintiff (appellant) Hazel Sullivan, formerly Hazel Walden, seeking possession of a homestead, partition of other real estate, and an accounting of rents and profits, against the defendants (appellees) Charles Sullivan, Fern Brandt and Esther Hucthinson, children of Henry Sullivan who died April 22, 1963. Plaintiff and Henry were formally married on April 5, 1963. On February 14, 1963, Henry, as a widower, conveyed by warranty deeds to the defendants, his children by a former marriage, the real estate in controversy. Plaintiff's claim was predicated on her rights as the wife of Henry under an alleged common-law marriage which the defendants, in their answer, denied.

The matter was tried to the district court without a jury. From a judgment in favor of the defendants the plaintiff has appealed.

The principal question on appeal is whether or not the trial court erred in concluding no common-law marriage existed between Hazel and Henry.

The trial court made extensive findings of fact which with but slight amplification provide sufficient background for proper understanding of our disposition of the case.

Henry Sullivan, a divorced man fifty-five years of age who owned and lived on a quarter section of land in Morton county, was introduced to Hazel Walden, a forty-eight-year-old widow, by her son Gene early in 1946. Henry and Hazel began dating one another, and after they had gone together for approximately a year, Hazel, at Henry's request, went to live with him on his farm on July 23, 1947. Although Henry asked Hazel to marry him before she went to live with him, and she consented, no formal marriage ceremony was performed. No definite marriage date was set, even though the matter of getting married sometime in the future was discussed quite often.

Immediately after moving to the farm Hazel assumed not only the name of Sullivan but also the duties of a wife. In turn, Henry assumed the duties usually performed by a husband. The couple lived together in Henry's house and shared the same bed from 1947 until Henry entered the hospital in early 1963, where on April 5, at Henry's insistence, they were formally married by a minister in Henry's hospital room.

During the period from 1947 to 1963 Henry and Hazel did not attempt to conceal the fact they were living together but did so openly. They were together constantly and often went to beer taverns in Rolla and Hugoton. The two of them took several trips together, staying at hotels and motels, where they registered as Mr. and Mrs. W. H. Sullivan or W. H. Sullivan and wife. On visits to Hazel's relatives and friends Henry was usually introduced by Hazel or her children as her husband.

There was testimony to the effect that Henry always referred to and introduced Hazel as "Mom," "Ma," or "my Mrs." and most of their friends called her "Mom" or "Ma" Sullivan; however, Henry's children and some of the close neighbors testified they knew and referred to plaintiff as Hazel Walden.

Being aware of the fact that Henry and Hazel were living together, his children, as well as a nephew, asked Henry at different

times whether or not he and Hazel were married and received profanely punctuated negative responses. One such occasion was in Hazel's presence. Hazel also told one of Henry's daughters on several occasions that she and Henry were not married. Approximately two months before Henry's death Hazel stated to Henry's other daughter, "Your daddy and I planned to get married but I guess we waited too long."

In 1948 the couple was involved in an automobile accident with a neighbor, and on the papers submitted by Henry to the neighbor for signature Hazel's name was listed as Walden. It was the testimony of this neighbor that she was never given the impression that Henry and Hazel were married, nor did she think they ever held themselves out to the public as husband and wife during all the years Hazel stayed at Henry's house; and to her knowledge the people in the community knew Hazel as Walden—not Sullivan.

In November 1960, Mr. A. E. Kramer, attorney for the defendants, prepared a will for Henry wherein Henry provided, among other things: "I give, devise, and bequeath unto my housekeeper, Hazel Walden, the sum of $1,000.00." This will apparently was lost or misplaced, and in February 1963, at Henry's request, Mr. Kramer prepared another will with the same provision as above quoted. The residue of his property Henry devised and bequeathed to his three children. It appears that Hazel was aware of the provisions of the will and voiced no objections thereto. There was further evidence that Hazel and Henry were in Mr. Kramer's office on two different occasions in 1962 and each time Henry introduced Hazel as Hazel Walden.

Certain documentary evidence covering the years 1950 through 1960 was introduced to substantiate the existence of a common-law marriage, but such evidence was controverted by the county enumeration records for the years 1961 through 1963 reflecting the names of W. H. Sullivan and Hazel Walden; the 1962 personal property tax statement signed by W. H. Sullivan, showing the names of W. H. Sullivan and Hazel Walden; Henry's income tax returns for a five-year period signed by him and claiming only himself as an exemption; and Hazel's 1961 income tax return signed Hazel A. Walden. Certain checks made payable to the plaintiff for the years 1959 through 1963 were also introduced into evidence. On at least two of them plaintiff's name appeared as Hazel Walden, and on one check from Henry to the plaintiff her

name appeared as Mrs. W. H. Sullivan, the check being marked "For Labor."

The court, in rendering judgment for the defendants, concluded:

"1. At all times material to this action Hazel Sullivan, formerly Hazel Walden, and William Henry Sullivan, also known as W. H. Sullivan and Henry Sullivan, were both single and had full capacity to enter into a marriage contract;

"2. The conversations and actions of Hazel and Henry, at the time they started living together in July 1947 amounted to a marriage *per verba de futuro cum copula*, or a marriage by words of future assent with copulation, which is not recognized in Kansas, rather than a marriage *per verba de praesenti*, or a marriage by means of words of present assent, which would constitute a common law marriage, which is recognized and upheld by the laws of Kansas. This relationship did not change until the legal marriage on April 5, 1963. I do not believe either party understood that they had assumed the marriage relationship.

"3. The plaintiff held herself out as the wife of Henry Sullivan except on rare occasions. Henry Sullivan held himself out as the husband of the plaintiff only when it suited his convenience, such as occupying the same bedrooms at hotels, motels, relatives and friends of the plaintiff and perhaps to their tavern friends."

Although the foregoing statements are under the caption "Conclusions of Law" in the journal entry of judgment, their essential character is such that we regard them as findings of fact on controverted issues and will so consider them. (*Burns v. Burns*, 87 Kan. 19, 123 Pac. 720.)

The plaintiff filed a motion for new trial on the grounds (1) of newly discovered evidence, and (2) the decision was contrary to the evidence produced by both parties substantiating the common-law marriage. The motion was overruled, and the ruling is included in the notice of appeal.

The plaintiff specifies several points of error, most of which may be grouped into the single contention that the findings and conclusions of the trial court were contrary to the evidence.

At the outset we are compelled to emphasize our function as an appellate court when the findings of a trial court are attacked for insufficiency of evidence or as being contrary to the evidence. It is the province of the trier of facts, not of this court, to pass on the credibility of witnesses and the weight of their testimony. As a reviewing court, we are confined to a determination of whether or not there is substantial and competent evidence to support the findings of the trial court. In making such determination, the record is examined in the light most favorable to the prevailing

party below, and when the findings are based on substantial, competent evidence, they are binding and conclusive on appeal, notwithstanding there may be evidence that would have supported contrary findings. Decisions in which these rules have been recognized and applied are legion. For a few of our recent cases see *In re Estate of Latshaw*, 194 Kan. 747, 402 P. 2d 323; *Callan v. Biermann*, 194 Kan. 219, 398 P. 2d 355; *Nelson, Administrator v. Dague*, 194 Kan. 195, 398 P. 2d 268; *Hendrixon v. Schemahorn*, 193 Kan. 640, 396 P. 2d 352; *Finnell v. Patrons Co-operative Bank*, 193 Kan. 354, 394 P. 2d 116; *Nichols Co. v. Meredith*, 192 Kan. 648, 391 P. 2d 136; *In re Estate of Guest*, 182 Kan. 760, 324 P. 2d 184.

The foregoing rules regarding appellate review have also been adhered to in cases involving the sufficiency of evidence to prove a common-law marriage. In *Hineman v. Hineman, Executor*, 179 many of our prior decisions are cited.)

". . . where the trial court has made findings of fact based upon substantial and competent evidence such findings will not be disturbed on appeal notwithstanding the record may reflect evidence which would support a contrary or different finding." (pp. 545-546.)

Also, see *Amerine v. Amerine, Executor*, 178 Kan. 79, 283 P. 2d 469.

The validity of common-law marriages has long been recognized in this state. The basic elements essential in establishing the existence of such marriage relationship are: (1) capacity of the parties to marry, (2) a present marriage agreement, and (3) a holding out of each other as husband and wife to the public. (See *Gillaspie v. Blair Construction Co.*, 192 Kan. 455, 338 P. 2d 647, in which many of our prior decisions are cited.)

Inasmuch as there is no question concerning the capacity of Hazel and Henry to enter into a common-law marriage, we will proceed directly to consideration of the second essential element, namely, the present marriage agreement. Plaintiff contends that her testimony required a finding by the trial court that there was such an agreement. A portion of her testimony was to the effect that she went to live with Henry July 23, 1947, "Because Henry asked me to marry him and I told him I would." Plaintiff seeks to sustain her contention on the basis that similar testimony was present in *Cain v. Cain*, 160 Kan. 672, 165 P. 2d 221, in which case a common-law marriage was found to exist; but a close reading of the decision reveals that this court did not consider that portion of the testimony as a significant factor which warranted the inference there was a present marriage contract.

A review of plaintiff's own testimony, a part of which is set out below, warranted the trial court's finding there was no present marriage agreement and that neither party understood they had assumed the marriage relation:

"He asked me if I would marry him and I said yes. That was before I went out there. I said at that hearing [before the Social Security examiner] that he put off getting married two or three times and kept putting it off. It was discussed pretty often and *most of the time we were talking about getting married in the future.* Prior to April 5, 1963, we never set a date to get married. . . . *Henry said we were not married but that we were going to get married.*" (Emphasis added.)

An analogous finding was upheld in *Pitney v. Pitney,* 151 Kan. 848, 101 P. 2d 933, in which this court stated that plaintiff's testimony established the parties cohabitated together upon the promise of the man to have a marriage ceremony performed in the future.

In reviewing the entire record, we concede there was evidence from which the court could have found that the parties intended a present marriage agreement; however, the evidence was conflicting, and the trial court, in its advantageous position as the trier of the facts, resolved the conflict against the plaintiff. We hold that the court's finding No. 2 was supported by substantial, competent evidence and cannot be disturbed on appeal.

In considering finding No. 3, which had to do with the third essential element of a common-law marriage, we construe it as a finding that there was no *mutual* holding out as husband and wife to the public. A lengthy narration of the testimony on this point would serve no useful purpose. It suffices to say there were acts and statements by Henry, as revealed by the testimony of Henry's three children, several of his neighbors and his nephew, that would support the court's finding. Also, the name Hazel Walden appearing on the accident report submitted by Henry in 1948, shortly after Hazel and Henry began living together, shed some light on the manner in which Henry desired their relationship to be considered by the public. Nor do we overlook the evidence that within a year preceding his death Henry introduced the plaintiff to his attorney as Hazel Walden on at least two separate occasions. Again, plaintiff asks us to re-examine the evidence from the "cold, printed page" and arrive at a different finding from that reached by the trial court. True, there were acts on the part of Henry that would sustain a contrary finding; however, under our well-defined rules, we are not at liberty to arrive at a determination

contrary to that of the trial court, since its finding is supported by substantial, competent evidence.

Plaintiff, in an effort to bolster her contention that a common-law marriage existed in spite of the evidence that she and Henry "were talking about getting married in the future," cites as authority *Gillaspie v. Blair Construction Co.*, supra, in which case the existence of a common-law marriage was sustained, although there was testimony that the parties had planned to go to Las Vegas in the coming year to have a ceremony performed. There, this court noted that the relationship was entered into in good faith and cohabitation was generally matrimonial in its inception; they publicly acknowledged each other as husband and wife, and were reputed to be such in the communities in which they lived. Because of these factors, the future ceremony contemplated by the parties lost its materiality to the relationship already established. The case provides but small measure of comfort for Hazel's cause. The trial court's findings Nos. 2 and 3 sustain neither a present marriage agreement nor a mutual holding out to the public, both of which were present in *Gillaspie.*

Plaintiff's contention that the trial court erred in overruling her motion for new trial on the ground of newly discovered evidence requires only brief attention. The new evidence was submitted in the form of an affidavit which contained the findings of the Social Security examiner, made after the trial of the instant case, in which Hazel's application for widow's insurance benefits as the common-law wife on Henry was sustained. Plaintiff advances no theory or authority which would permit the examiner's findings to be admitted into evidence before the trial court in a new trial. Plaintiff candidly admits the evidence before the examiner was nearly identical to that presented to the district court. Under such cricumstances plaintiff's motion for new trial on this ground amounts to no more than a request to the trial court to reweigh the same evidence and arrive at a different conclusion. Such a request is clearly an abortive effort to distort the principles upon which a new trial may be granted on the ground of newly discovered evidence. (*Mourning v. Harrison*, 154 Kan. 242, 118 P. 2d 558. Also, see K. S. A. 60-259 (*a*) *Fifth.*)

The plaintiff summarizes her argument with a statement that this court is confronted with a case involving equities which require a judgment in her favor. The inflexible rules of appellate review

demonstrate the weakness of such argument. We acknowledge the evidence might well have sustained a result contrary to that reached by the trial court; however, since this was essentially a fact case which initially the trial court was called upon to resolve, its findings cannot be disregarded by this court, even in the face of equities that to the plaintiff may seem of an overwhelming nature.

Other points advanced by the plaintiff have been considered and found to be without merit. The judgment is affirmed.

FROMME, J., not participating.