No. 47,440

Concerned Citizens, United, Inc., Alex and Elizabeth Johnson,. Clarence and Agnes Rezac, Joseph and Dorothy Straub, *Appellants,* v. The Kansas Power and Light Company, *Appellees.*

(523 P. 2d 755)

Opin-
ion filed June 15, 1974.

*Bruce J. Terris,* of Washington, D. C., argued the cause and *Nathalie V. Black,* of Washington, D. C., and *Richard H. Seaton,* of Manhattan, were with him on the brief for the appellants.

*James D. Waugh,* of Cosgrove, Webb & Oman, of Topeka, argued the cause, and *Edward L. Bailey,* of the same firm, was with him on the brief for the appellee.

*Collister & Kampschroeder,* of Lawrence, and *James Concannon,* of Topeka, were on the brief *amicus curiae,* for Wolf Creek Nuclear Opposition, Inc.

*Vern Miller,* attorney general, *Lance W. Burr,* assistant attorney general and *William H. Ward,* assistant attorney general, were on the brief *amicus curiae,* for the State of Kansas.

The opinion of the court was delivered by

SCHROEDER, J.: This is an injunction action wherein the plaintiffs by their petition seek to enjoin the exercise of the power of eminent domain by the Kansas Power and Light Company (hereafter KPL) to obtain land for the construction of an electric power facility, unless and until it has demonstrated at least the reasonable likelihood that it can obtain necessary federal and state permits and zoning, and until it has definite plans in the reasonably near future to use the land for the production of electric power. Appeal has been duly perfected by the plaintiffs from an order of the District Court of Pottawatomie County, Kansas, denying their petition.

The appeal concerns the application of the Kansas law on eminent domain to the development of a huge energy center which KPL proposes to construct and operate.

The huge electric power complex proposed by KPL consists of one of the largest coal-burning power plants in the country and numerous appurtenances. The energy center will consist of four coal powered electric generating units, each unit capable of generating 680 megawatts of electric energy. The proposed center will be located on a site comprising 12,800 acres, north of Belvue, in Pottawatomie County, Kansas. Construction of the first unit is scheduled to start immediately, and the first unit is expected to be finished and "on line" (generating electricity) in 1978. Unit No. 2 is presently planned to be "on line" in 1979 or 1980. Units No. 3 and 4 are planned to be "on line" no earlier (and probably later) than 1981 and 1984, respectively.

The appellants consist of the owners of a portion of the 800 acres of land needed by KPL to start work on the first unit of the energy center, plus the owners of some of the other acreage within the proposed energy center which KPL has, to date, been unable to purchase, and Concerned Citizens, United, Inc., a corporation.

Prior to the time KPL filed its petition to condemn the 800 acres

it needed, this action was filed by the appellants wherein they sought to enjoin KPL from condemning land in the proposed energy center area, unless and until (*a*) KPL obtained certain "necessary federal and state permits", (*b*) KPL has demonstrated that it can comply with federal and state laws, (*c*) KPL has received a change in the zoning of the land it seeks to condemn, and (*d*) KPL had definite plans in the reasonably near future to use the land for its purposes.

About two weeks after the appellants filed their petition for injunctive relief, KPL filed a petition seeking to acquire 800 acres (originally 860 acres) by eminent domain. Since the hearing in the trial court on this case, KPL has purchased a portion of the land involved in that condemnation case, so the total land which it sought to take, and has taken, is only 480 acres. However, all references will be to the 800 acres which were then the subject of the condemnation proceeding.

About two weeks after the filing of the condemnation proceeding, KPL filed its answer in this action, which put all matters at issue. The case went to trial, commencing December 19, 1973. The evidence was not developed in the customary manner, since the appellants relied heavily upon KPL's witnesses.

Prior to considering the possibility of a new energy center, KPL needed to determine if additional generating facilities were necessary for its purposes as an electric public utility. Their past and present projections led them to an inescapable conclusion that additional electric generating facilities are necessary now, and will be critically necessary by 1978, which is the first time the proposed energy center will be capable of generating electric energy from its first unit.

Once the necessity for additional generating facilities became apparent, KPL commenced determination of many technical, economic and environmental considerations concerning its proposed energy center. The important considerations—those at issue during the trial—and the manner by which KPL came to grips with these considerations are:

1. A determination was made of the fuel to be used for generation of electricity. In 1970 KPL considered the possibilities and concluded that the use of oil or gas as a primary fuel would be unwise from the standpoint of availability. In addition, a nuclear reactor was considered, but only in the context of extremely long

range planning, and no commitment was made to use a nuclear reactor for the generating plant because of economic factors peculiar to the type of energy load and capacity experienced by KPL. Finally, KPL considered using coal as a fuel. However, KPL was concerned about the widely recognized problems encountered in the use of coal as a fuel, because of its tendency to produce particulates and sulfur dioxide, the emission of which substances from electric generating plants is regulated by state and federal air quality laws. Therefore, the final decision to use coal was not made until such time that KPL located, negotiated for, and obtained a contract for the purchase of 220 million tons (which is a 40 year supply) of the cleanest (low sulfur content) coal in the country. KPL did not obtain a complete analysis of the trace elements—the heavy metals—which might be present in the coal in question; there are no federal or state regulations which limit or control the emission of trace elements, and their tolerance levels (the concentrations at which such trace elements become a health hazard) are not known.

2. KPL considered numerous possibilities before determining the location of the energy center. Expanding one of the existing plant sites was ruled out because of the lack of space or from environmental considerations. The possibility of locating the plant at the coal mine in Wyoming, and transporting the electric energy back to Kansas was ruled out since prior study concerning the location of a plant in Western Kansas had been found to be not feasible from an economic standpoint. Therefore, KPL decided to locate its plant where (1) there was a low population density reasonably remote from high population centers with a reasonably low impact upon the environment, (2) there was availability of adequate water and a topography which would lend itself to water storage, (3) rail transportation was available, so that the fuel could be delivered to the plant site, and (4) the site would be reasonably close to the center of the load system of the company. Thirteen sites were considered and, after study, the present site was selected.

3. A determination was made to obtain and maintain an adequate water supply without creating serious problems to other water users. This question was involved in the selection of the site. Here, KPL determined to locate reasonably close to the Kansas River. Although they originally contemplated taking most of their needed water from the river, they later concluded that water from

wells in the river bottom land would be available in sufficient supply for Units No. 1 and 2 of the proposed plant, and further, that use of well water would be more economical than taking river water from the outset. Preliminary application has been made for obtaining water in this manner, and in the opinion of experts, no technical or physical problems will be encountered. If and when Units No. 3 and 4 are constructed, steps will be taken to obtain water from the river. At that time, a permit from the Corps of Engineers will be necessary, which may require an environmental study. KPL's consulting engineer is totally familiar with such permits and studies, and anticipates no problems in this regard. In order to insure that the impact upon other water users of both river and well water be kept at a minimum, KPL determined to construct two reservoirs on the plant site to store water for use in periods of drought, and further, to purchase water owned by the State of Kansas and stored in the Milford Reservoir, which water could be directed into the Kansas River, from time to time, if such be needed to minimize the impact of KPL's use of water.

4. A determination was made to control disposal. Here KPL has determined that it will avoid any stream pollution by utilizing a "zero discharge" concept. Under this system, the waste from the plant operation (ash and such trace elements that may exist in the coal) will be held in an 800 acre impoundment area, which has been sealed at the bottom so that none of the wastes can percolate into the ground. These waste materials will be transported to the impoundment area by water which will then be recirculated, but controlled in volume so that there will be absolutely no waste water runoff. In the opinion of experts, this can and will be done.

5. A determination was made of air quality control. Here, KPL did not stop after obtaining the cleanest coal; to the contrary, KPL determined to use the most modern and reliable technology in order to remove the substances which are regulated and controlled by federal and state air quality laws from their stack emissions. Nitrogen dioxide will be removed to the greatest extent technologically possible by the use of a furnace combustion chamber which has been guaranteed to meet all federal and state requirements with respect to the control of nitrogen dioxide. In addition, KPL, which is a pioneer in the use of "scrubbing equipment"—equipment which cleans sulfur dioxide and particulates from stack gases —has determined that it will use such equipment on this clean

coal, despite the fact that, even if such equipment were not used, the stack emissions from the use of this clean coal in this plant would comply with state and federal regulations. Sixty per cent of the sulfur dioxide and 99.2% of the particulates will be removed from the stack gases by use of the scrubbing system. However, KPL has not committed itself to any specific system, and will not do so until such time as they are certain that they have access to the latest possible technological advances to incorporate into that system.

Having determined to minimize its environmental impact concerning its use of water (by utilizing water storage reservoirs and making arrangements for the purchase of additional water from the state), and having determined to minimize environmental problems arising as a result of the use of nuclear fuels (by determining that it has no present plans to use nuclear fuels), and having determined to minimize the environmental problems with respect to air quality (by the use of scrubbing equipment on the cleanest available coal) KPL made calculations concerning the effect of the proposed plant on air quality. The calculations show (and the trial court found) that when the energy center is totally completed, and all four units are running at 100% capacity, and the worst possible weather conditions prevail, the energy center will not violate any existing state or federal law with respect to air quality control, which is the only area of environmental law where there are specific standards of conduct and performance.

The appellants contend the power complex will cause significant environmental effects and injury to the surrounding area. They argue all coal-fired power plants produce particulates, sulfur dioxide, and nitrogen dioxide, which cause injury to health such as lung damage, leading to emphysema and possibly to cancer. The sulfur dioxide and nitrogen dioxide combine with moisture in the atmosphere to form, respectively, sulfuric and nitric acids. These acids are harmful chemical compounds which cause chronic lung damage and may lead to cancer. Western coal, such as will be used in this power plant, contains trace elements such as mercury, cadmium, arsenic, fluoride, selenium, chromium, lead, beryllium, and radioactive elements. These trace elements are hazardous to human and animal health and cause such damage as injury to the nervous system, injury to the liver and kidneys, lung damage, digestive tract irritation, cancer and birth defects. The coal under

contract for the this plant has been tested for mercury and fluoride content, but not for any of the other trace elements. There is no known tolerance level for these elements. Air-borne pollutants may travel from ten miles up to 100 miles and sulfuric and nitric acids return to earth in rainfall and mist. Indeed, the stacks 600 feet high, rising from an elevation 300 feet higher than the nearest towns, were deliberately chosen to disperse the pollutants produced by the plant over a broader area.

The appellants further argue the cooling towers of the type planned for this plant can cause fog over five to ten miles. This fog plume could interact with the pollutant emissions to cause acid rain.

The appellants further argue the plant will require massive amounts of water, 40,000 acre feet annually, and that no study had been completed concerning the impact on other users of taking such large amounts of water from ground wells or from the Kansas River. They further argue there has similarly been no study completed on whether the polluted water discharged into the ground will contaminate ground water supplies in the vicinity.

After hearing the case the trial court announced its decision by a memorandum setting forth its findings of fact and conclusions of law. The memorandum decision is appended hereto and is incorporated herein by reference.

A brief review of some of our decisions will serve to orient the posture of this case within the framework of our eminent domain law.

In *Sutton v. Frazier*, 183 Kan. 33, 325 P. 2d 338, this court said:

"An eminent domain proceeding is a special statutory proceeding and is not a civil action covered by the code of civil procedure. The proceeding is administrative rather than judicial, and its nature is the same whether conducted by or before a district court, or any judge thereof, the probate court, or its judge, a board of county commissioners or any other official board or tribunal authorized by the legislature to act in that capacity. The amount to be paid is determined by commissioners or appraisers and not by the board or tribunal appointing them or with whom they filed their report. The report of the amount found due is an award and is not a judgment. Prior to an appeal from the award the proceeding is in the nature of an inquest.

"The eminent domain proceeding does not provide a forum for litigation of the right to exercise the power of eminent domain nor the extent thereof. Upon appeal to the district court from an award the sole issue is the amount of compensation due and no contest of the condemner's right to exercise the power of eminent domain is permitted. The condemnees may and must litigate the condemner's right to the exercise of the power of eminent domain in an indi-

vidual civil action, usually by suit for injunction. (*State Highway Commission v. Griffin*, 132 Kan. 153, 294 Pac. 872; *Glover v. State Highway Comm.*, 147 Kan. 279, 77 P. 2d 189, *State v. Boicourt Hunting Ass'n.*, 177 Kan. 637, 282 P. 2d 395; *Board of Education of the City of Nickerson v. Gum*, 178 Kan. 397, 285 P. 2d 780; and *Cline v. Kansas Gas & Electric Company*, 182 Kan. 155, 318 P. 2d 1000.)" (pp. 37, 38.)

The substance of the foregoing is that a landowner is not deprived of any of his rights to contest the validity of a condemnation proceeding itself, the only requirement is that in order to enforce his rights he is required to raise them in a separate independent action, such as for injunctive relief. (*Cline v. Kansas Gas & Electric Company*, 182 Kan. 155, 318 P. 2d 1000.)

The power of eminent domain is an inherent power which is vested exclusively in the sovereign—the State of Kansas. Implicit in, and as an integral part of, that power is the authority in the sovereign, acting through the legislature, to delegate the power of eminent domain. (*Mid-America Pipe Line Co. v. Missouri Pac. Railroad Co.*, 298 F. Supp. 1112 [D. Kan. 1969]; and Nichols on Eminent Domain, § 3.21 [2] [rev. 3rd ed. 1973].)

In *Urban Renewal Agency v. Decker*, 197 Kan. 157, 415 P. 2d 373, the court said:

"The legislature has the inherent power of eminent domain limited only by constitutional restrictions. *Such power may be delegated by the legislature to any public authority to be exercised as directed.* . . ." (Emphasis added.) (p. 162.)

In Kansas, the power of eminent domain has been delegated by the sovereign, acting through the legislature, to KPL by virtue of K. S. A. 17-618. That delegation of power is limited, however, in the manner in which KPL is to exercise the power. The statute provides that KPL is to exercise its power of eminent domain in the manner set forth in K. S. A. 26-501 to 26-516.

In order to remove any question concerning what conditions and limitations were placed upon KPL in its exercise of the power of eminent domain, the legislature reiterated, in K. S. A. 26-101, that KPL's power of eminent domain was limited, in that it could be exercised only in the manner set forth in the Eminent Domain Procedure Act, K. S. A. 26-501 to 26-516.

In K. S. A. 26-502 the legislature specifies the basic allegations which the petition in an eminent domain proceeding shall include.

K. S. A. 26-504 provides in part:

"*If the judge finds from the petition:* (1) *the plaintiff has the power of*

*eminent domain;* and (2) *the taking is necessary to the lawful corporate purposes of the plaintiff, he shall enter an order* appointing three (3) disinterested householders of the county in which the petition is filed to view and appraise the value of the lots and parcels of land found to be necessary, and to determine the damages to the interested parties resulting from the taking. . . . *The granting of an order determining that the plaintiff has the power of eminent domain and that the taking is necessary to the lawful corporate purposes of the plaintiff shall not be considered a final order for the purpose of appeal to the supreme court,* but an order denying the petition shall be considered such a final order.

"Appeals to the supreme court may be taken from any final order under the provisions of this act. . . ." (Emphasis added.)

The above statute must be construed to mean that if the appellants seek to contest KPL's power of eminent domain or if the appellants seek to contest KPL's decision that the taking of the land here in question is necessary to its lawful corporate purposes the appellants must do so in an independent action. In other words, the appellants have no power to stop the progress of the eminent domain proceeding by the public utility, where the trial court grants an order determining that the plaintiff has the power of eminent domain and that the taking is necessary to the lawful corporate purposes of the plaintiff, in the eminent domain proceeding itself.

We think it immaterial on the facts in this case (see trial court's findings) that the injunction action herein was filed shortly prior to the filing of the petition in eminent domain by KPL. Plans for the project had already been announced and KPL had begun to purchase some of the land needed for the project.

Actually, the appellants are not contesting the power of eminent domain conferred upon KPL by the legislature, but they are contesting whether the taking of the land here in question for the energy center is necessary to the lawful corporate purpose of KPL. If there is *no reasonable probability* that KPL can construct and put its energy center into operation, the taking of the land in question is not necessary to the lawful corporate purposes of KPL. It is within the narrow confines of this issue that the petition of the appellants is lodged. The petition seeks to enjoin the exercise of the power of eminent domain by KPL.

It must be recognized where an eminent domain proceeding is initiated by the filing of a petition in the district court, the determination that *the taking is necessary to the lawful corporate purposes of the plaintiff is made by the district court from the allega-*

*tions of the petition itself. The decision that the taking is necesary to the lawful corporate purposes of the condemning authority is a decision made by the condemning authority.* In contesting such decision the question immediately arises: To what extent is the decision of the condemning authority reviewable, and when the decision is contested upon whom is the burden of proof cast?

The foregoing questions were touched upon in the *City of Winfield v. Board of County Commissioners,* 205 Kan. 333, 469 P. 2d 424. There the court said in the opinion:

"Here the cities, acting pursuant to their authority under eminent domain, originally determined the tracts of land necessary to be taken in connection with the airport facility. This was their exclusive right, and in the exercise of their discretion it is not subject to judicial review in the absence of fraud, bad faith or abuse of discretion. (*Bowers v. City of Kansas City,* 202 Kan. 268, 448 P. 2d 6.) After this airport facility was returned to the cities by the United States Government, the entire area remained intact as an airport, and no part of it has been declared by the cities to be unnecessary for airport purposes. It is being operated as an airport facility pursuant to Federal regulations, . . ." (pp. 337, 338.)

The point is further clarified in *Bowers v. City of Kansas City,* 202 Kan. 268, 448 P. 2d 6. There the court had before it an injunction action wherein action under the power of eminent domain was contested in connection with an urban renewal project. In the opinion the court said:

"Cases involving interpretation of the Urban Renewal Law (K. S. A. 17-4742, *et seq.*) have on several occasions appeared before this court. In *Urban Renewal Agency v. Decker,* 197 Kan. 157, 162, 415 P. 2d 373, we said it was the municipality which in the first instance has the exclusive right 'to determine what lots, parcels or tracts of land are to be taken' as part of an urban renewal project, and that its exercise of discretion is not subject to judicial review absent proof of fraud, bad faith or abuse of discretion.

"In other cases we have held that action taken by public authorities under the Urban Renewal Law is subject to judicial review when the same is arbitrary, capricious or fraudulent, and that when urban renewal officials act in bad faith or have abused their discretion, an aggrieved party may maintain an action for injunctive relief. (*Offen v. City of Topeka,* 186 Kan. 389, 350 P. 2d 33; *Brick v. City of Wichita,* 195 Kan. 206, 403 P. 2d 964.) It is thus to be observed that the same considerations apply to the review of administrative actions taken by urban renewal authorities, as those taken by other public officials, namely, that public officers are presumed to have performed their public functions properly and in good conscience, and that the burden of establishing bad faith, fraud, or arbitrary and capricious conduct on their part lies with the party alleging it. (*Moyer v. Board of County Commissioners,* 197 Kan. 23, 415 P. 2d 261; *Arkenberg v. City of Topeka,* 197 Kan. 731, 421 P. 2d

213; *Eastborough Corporation, Inc., v. City of Eastborough,* 201 Kan. 491, 441 P. 2d 891; *Urban Renewal Agency v. Decker,* supra.)" (pp. 270, 271.)

It has also been held that *a public utility which has the power of eminent domain* is vested with reasonable discretion to determine the amount of land necessary for its lawful corporate purposes, and when such discretion is exercised it will not be disturbed on judicial review unless fraud, bad faith or an abuse of discretion is shown. (*Shelor v. Western Power & Gas Co.,* 202 Kan. 428, 449 P. 2d 591.) Other decisions of like import are *State Highway Comm. v. Ford,* 142 Kan. 383, 46 P. 2d 849; *Soden v. State Highway Commission,* 192 Kan. 241, 387 P. 2d 182; *Urban Renewal Agency v. Decker,* supra; and *Reinecker v. Board of Trustees,* 198 Kan. 715, 426 P. 2d 44.

Since fraud and bad faith have been eliminated as issues in the instant case by stipulation at the pretrial conference, the trial court merely observed that this case would be tried, as all other Kansas cases seeking to enjoin condemnation, on the issue whether KPL was guilty of abuse of discretion. KPL had previously requested the trial court to rule upon questions of (1) whether or not a demonstration of compliance with federal and state law is a condition precedent to condemnation, and (2) whether the burden was upon the appellants to prove that KPL could not comply with federal or state law or the burden was upon KPL to demonstrate that it could comply. On these questions the trial court made no ruling.

From all of the evidence the trial court found that KPL will comply with all applicable standards and will meet all requirements for the issuance of all necessary permits. Since the trial court found that KPL had the ability to comply with federal and state law, the trial court obviously reasoned that the two rulings above requested by KPL were moot.

On the present state of Kansas law a public utility with power of eminent domain is vested with reasonable discretion to determine the necessity for the taking of land for its lawful corporate purposes, and when such discretion is exercised it will not be disturbed on judicial review unless fraud, bad faith or an abuse of discretion is shown. In an injunction action the burden of proof is upon those attacking the decision of the public utility.

While the appellants in their brief discuss decisions from foreign jurisdictions (*Seadade Industries, Inc. v. Florida Power & Light Co.,* 245 So. 2d 209, 47 A. L. R. 3rd 1255 [Fla. 1971]; *Hillsboro*

*Island H. C. A. v. Town of Hillsboro Beach,* 263 So. 2d 209 [Fla. 1972]; *Dade County v. Paxson,* 270 So. 2d 455 [Fla. App. 1972]; *Minnesota Canal & Power Co. v. Pratt,* 101 Minn. 197, 112 N. W. 395 [1907]; *Department Public Works v. Engel,* 315 Ill. 577, 146 N. E. 521 [1925]; and *New Lisbon v. Harebo,* 224 Wis. 66, 271 N. W. 659 [1937]) which cast the burden of proof in cases such as this upon the condemning authority, they concede under Kansas law they had the burden to produce evidence sufficient to establish a *prima facie* case to show that KPL abused the exercise of its power of discretion. Once, however, the *prima facie* case was established, the appellants argue, KPL had the burden of going forward with the evidence to rebut that *prima facie* case. (Citing, *Baumel v. Travelers Insurance Company,* 279 F. 2d 780, 784 [2d Cir. 1960]; *McElroy v. Force,* 75 Ill. App. 2d 441, 220 N. E. 2d 761 [1966], affirmed, 38 Ill. 2d 528, 232 N. E. 2d 708 [1967]; *Williams v. Fiedlar,* 22 Mich. App. 179, 177 N. W. 2d 461 [1970], affirmed, 386 Mich. 221, 191 N. W. 2d 52 [1971]; and Jones on Evidence, § 5:2 [6th ed. 1972].) This obligation to produce evidence to counter a *prima facie* case, it is argued, is especially strong in the situation where the defendant has possession of information not available to the plaintiff. (Citing, *United States v. Denver & R. G. R. R.,* 191 U. S. 84, 92 [1903], 48 L. E. 106, 24 S. Ct. 33.)

The appellants argue in the instant case they have shown KPL must obtain numerous permits from federal and state authorities and must comply with many applicable federal and state statutes and regulations. The appellants contend at the very least they presented a *prima facie* case that KPL did not make adequate studies to show that the zoning and permits can be obtained and the statutes and regulations complied with. It is urged that the district court's ruling denying KPL's motion for a directed verdict at the close of the appellants' case confirms that the appellants did present a *prima facie* case. The appellants argue in these circumstances, with the relevant information in the control of KPL, that KPL had the positive duty to present evidence which would reasonably indicate that it would be able to qualify for the permits and approvals essential to its project and comply with applicable law. Failing such a showing, it is argued, a court may properly draw the inference that such information in fact did not exist, or that it indicated the permits would not be granted and the law not complied with.

The specific points asserted by the appellants on appeal for reversal of the trial court's judgment are:

"1. The power of eminent domain must be strictly construed and not exercised in such a way as to constitute an abuse of discretion.

"2. KPL's exercise of the power of eminent domain constitutes an abuse of discretion in the following respects:

a. the selection of the plant site was made without consultation with or approval of state or county officials;

b. the selection of the plant site was made without adequate consideration of relevant environmental factors concerning alternative sites;

c. KPL has failed to study and consider all relevant factors concerning the environment of the area selected;

d. there has been no showing of reasonable likelihood that KPL will be able to obtain necessary state and federal permits and approvals and to comply with federal and state laws;

e. the plant will violate the federal air quality law;

f. KPL has not obtained the necessary zoning, has made no attempt to obtain it prior to seeking exercise of the power of eminent domain, and has shown no reasonable likelihood that it will be obtained;

g. KPL is threatening to take land which it will not need in the reasonably near future and which is excessive for presently planned needs.

"3. KPL's exercise of the power of eminent domain is unlawful in that it is not taking land for its lawful corporate purposes unless the land can be used for those purposes:

a. The land cannot be used for KPL's lawful corporate purposes because proper zoning has not been obtained.

b. The land cannot be used for KPL's lawful corporate purposes because no reasonable likelihood has been shown that the necessary federal and state permits and approvals can be obtained and federal and state law complied with.

c. The land cannot be used for KPL's lawful corporate purposes because the power complex will violate federal air quality law.

d. The land is not necessary for a lawful corporate purpose because it will not be used in the near future and the amount sought is excessive for presently planned needs."

It is clear under Kansas law that the only power to condemn property is provided by statute. In *Strain v. Cities Service Gas Co.,* 148 Kan. 393, 83 P. 2d 124, the court said:

"The power of eminent domain can only be exercised by virtue of a legislative enactment. The right to appropriate private property to public use lies dormant in the state until legislative action is had, pointing out the occasions, modes, conditions and agencies for its appropriation." (p. 395.)

Although a statute which confers the right to exercise the power of eminent domain is to be strictly construed, this doctrine does not preclude the reasonable and sound construction thereof in the light of the objectives and the purposes sought to be attained by its enact-

ment. (*Spears v. Kansas City Power & Light Co.*, 203 Kan. 520, 455 P. 2d 496.)

The appellants' first point is embodied in our previous discussion of the law of eminent domain in Kansas.

One of the basic issues asserted by the appellants in their second point is that the utility must secure zoning approval for its intended use of the land prior to the time it actually condemns the land. In other words, the appellants contend that zoning is a condition precedent to the exercise of the power of eminent domain by KPL.

While it is acknowledged that condemnation is supposed to be used in the public interest, it is argued the primary purpose of zoning regulations is to promote the public interest.

K. S. A. 1973 Supp. 19-2914 provides in part:

"For the purpose of promoting the public health, safety, morals, comfort, and general welfare, conserving and protecting property and building values throughout any county . . . the county commissioners of all counties in this state may provide for the preparation, adoption, amendment, extension and carrying out of a comprehensive plan. . . ."

K. S. A. 1973 Supp. 19-2919 provides:

"For the purpose of promoting health, safety, morals, comfort or the general welfare, and conserving and protecting property values throughout the county or portions thereof, the board of county commissioners of any county may by resolution at a regular meeting of said board, provide for the adoption, or amendment, of zoning regulations in the manner hereinafter provided. . . ."

It is argued from the foregoing statutes, there can be nothing wrong in determining whether proposed rezoning necessary to allow implementation of KPL's utility plan is desirable *before* condemnation. Any hearing procedure, and determinations in pursuance thereof, that considers "health, safety, morals, comfort, or the general welfare," in relation to a public project, it is argued, is not contrary to the philosophy supporting the eminent domain concept. It is therefore asserted that the initial issue which ought to be considered is whether or not the proposed project in Pottawatomie County is consistent with the health, safety, and general welfare. It must be conceded that up to this time the only entity which has considered that subject, assuming it was in fact considered, is the public utility itself.

The argument to support the requirement of zoning as a condition precedent to condemnation proceeds as follows: Assuming that there has to be some determination on the zoning question, and no argument has been made that the determination is unnecessary, how

can it hurt the public utility to have that determination made at the commencement of the project before the expenditure of any moneys, or the construction itself. Ultimately the public is going to pay for whatever the public utility builds. It would seem to be in the public interest to require study and decision by appropriate governmental bodies prior to the expenditure of money or commencement of construction.

It is argued that the private property owner's right ought to be protected to the utmost in the absence of any compelling need to destroy or any way adversely affect such right. Why should his land be taken first, and then a determination made as to the ability of the condemner to complete the project? His right is being subverted for no sensible reason, and surely not pursuant to the command of any legislative or constitutional mandate. Nowhere is there a legislative or constitutional requirement that his land be condemned, that he be dispossessed to whatever extent applicable, and that subsequent to that time a determination will be made whether in fact the public improvement can be completed. It is argued, it does not make sense to use that approach.

The attorney general in his brief *amicus curiae* calls our attention to the fact that the Kansas lawmakers may shortly conduct a complete review of Kansas land use planning policy, in response to pending federal law. In preparation for that, the special legislative committee on land use planning has been studying the topic for three years during the interims of the Kansas legislature. The attorney general points out the eventual impact upon zoning, the present land use planning system established by law, is unknown. On the other side of the issue, the special committee on transportation and utilities is studying all aspects of the exercise of the power of eminent domain by public utilities.

The attorney general in his brief argues, that if the county commissioners decide to preserve the agricultural nature of the area in question, disapproving the rezoning request, and if their decision is sustained as not being unreasonable or arbitrary, then a conflict would exist between the exercise of the delegated powers of eminent domain and zoning. The resolution of that conflict would seem to be beyond any judicial reconciliation of the two delegations, requiring a new look by the legislature at the problem of how and where important decisions regarding land use are to be made.

The above conflict must be recognized, but its resolution lies within the domain of the legislature.

As previously stated in this opinion, the legislature has the inherent power of eminent domain limited only by constitutional restrictions. Such power may be delegated by the legislature to any public authority *to be exercised as directed.*

The power of eminent domain has been delegated by the sovereign, acting through the legislature, to KPL by virtue of K. S. A. 17-618. We have heretofore indicated the only limitations placed upon KPL in the exercise of that power of eminent domain by the legislature. The statutes which delegated the power of eminent domain to KPL contain absolutely no other conditions or limitations on the exercise of that power. There are no other statutes which limit KPL's exercise of the power so delegated.

We think the intention of the legislature to impose no other conditions precedent upon KPL's exercise of the power of eminent domain is clear. In 1963, the legislature completed the task of redrafting the entire Kansas law on eminent domain (Laws, 1963, ch. 234). The first sixteen sections of that chapter contain the new Eminent Domain Procedure Act. However, the legislature did not stop there. The chapter contains 104 sections. The last 88 sections contain the delegations of the power of eminent domain to various governmental and quasi-governmental divisions of the state (counties, townships, cities, etc.), administrative bodies, and some corporations. What is of importance is that in many cases the legislature, in drafting the power of eminent domain, limited and restricted the exercise of that power to certain stated conditions. Among these sections, as an example, is K. S. A. 80-2401, which requires the existence of proper zoning as an express statutory condition precedent to condemnation. Many other sections could be cited and given as examples where conditions were expressly imposed. It is absolutely clear that the legislature intended to impose conditions precedent to the exercise of the power of eminent domain in some situations but not in others. Thus, although obtaining approval of governmental agencies prior to condemnation is required in K. S. A. 12-638 and 24-305 (among others), it is not required of KPL. And although approval of site selection is a required preliminary step to condemnation under K. S. A. 13-13c05, it is not required of KPL. A survey—which is a form of a study—is required prior to condemnation under K. S. A. 24-438 and 24-467, but no survey or other study is required of KPL. Clearly, had the legislature intended

to impose conditions precedent upon KPL's exercise of its power of eminent domain, the legislature would have so provided.

Obviously there are many requirements and problems which KPL must meet and solve before it is able to operate the first unit of its energy center in Pottawatomie County. But there is no statutory requirement that rezoning precede the condemnation. A somewhat similar situation faced the court in the case of *Gulf Railroad Co. v. Shepard*, 9 Kan. 647. There a railroad company condemned the right of way across a landowner's property, and the landowner later brought an action for trespass, alleging, among other things, that the condemnation was invalid because the railroad company was required by statute, as a condition precedent to exercise of the power of eminent domain, to file a map of the route of the railway in the office of the county clerk. The Supreme Court held the filing of the map was not a condition precedent to the condemnation. It construed the statute as requiring the filing of a map before constructing any part of the road. In the opinion the court said:

". . . If the legislature had intended the filing of this map and profile to be a portion of the condemnation proceedings, it seems as though they would have inserted the requirement somewhere in this article, and not have placed it, where it is, in an article declaring certain general powers and duties of railroad corporations. . . ." (p. 653.)

There is another reason why zoning is not a condition precedent to KPL's exercise of its power of eminent domain. The county commissioners of each county have been granted the power to zone property within the county by virtue of K. S. A. 1973 Supp. 19-2914, *et seq.* K. S. A. 19-2920 provides the method for amending or changing the zoning of property within the county. It provides in part:

". . . A proposal for an amendment or change in zoning may be initiated by the board of the county commissioners, the planning board or upon application of the owner of property affected. . . ."

Obviously, in order to obtain a change in zoning, a "proposal" for such change must be "initiated". Both the board of county commissioners and the planning board had plenary power to "initiate" such proposal. The only other person who may "initiate" such a change in zoning is "the owner of property affected", who must make application for such change. Applying the time honored rule of statutory construction, "expressio unius est exclusio alterius",

it is apparent that one who is not the owner of property affected may not make application for a change in zoning.

An entity seeking to condemn property obviously does not own the property which it seeks to condemn; if it did own the property, there would be no reason for condemnation. Therefore, it cannot apply for a change in zoning; there simply is no statutory authority or procedure for such application.

The various factors assigned by the appellants in their statement of points to show KPL's abuse of discretion in the exercise of its power of eminent domain are controlled by basic determinations concerning the law.

By their petition the appellants sought to enjoin condemnation on the part of KPL unless and until (1) KPL obtained necessary federal and state permits, (2) KPL demonstrated it could comply with relevant law, (3) KPL received proper zoning, and (4) KPL had definite plans for the use of the land in the near future. For the first time on appeal the appellants contend condemnation should be enjoined unless and until (5) some county official or some state official or both have approved the site desired to be taken, and (6) studies of environmental factors measuring up to the standard of "adequate" have been completed. These additional issues were not raised as grounds for injunctive relief in the trial court. They are raised for the first time on appeal. We regard them as immaterial considerations and will not devote independent attention to them.

Further discussion will proceed upon the assumption that the reader has familiarized himself with the findings of fact and the conclusions of law made by the trial court, appended hereto.

In finding No. 54 the trial court found from all the evidence that in the construction and operation of the energy center here under consideration, KPL will comply with all applicable standards and meet all requirements for the issuance of all necessary permits. From all the evidence it found that the operation of this energy center will not violate existing standards, regulations or laws.

The trial court concluded (conclusion No. 6) that KPL was not required to have in hand all permits required for operating and constructing the plant at the time of proceeding in eminent domain to acquire land for the site.

The trial court also concluded (conclusion No. 7), upon a showing made that KPL can and will meet all applicable air and water quality standards, it cannot be said that KPL has abused its discretion.

It is not an absolute condition precedent to the exercise of the power of eminent domain that the condemning authority demonstrate that it can comply with future federal and state law.

It has heretofore been stated that the trial court was not concerned with the burden of proof in this case, it merely observed that this case would be tried, as all other Kansas cases seeking to enjoin condemnation, in that the issue would be whether or not KPL was guilty of abuse of discretion in the exercise of its power of eminent domain.

As a precedent to the crucial point in this lawsuit lies in pursuit of the burden of proof.

If the decision of KPL to exercise its power of eminent domain and take land which it determines necessary for its lawful corporate purposes—to construct and operate the huge energy center contemplated—is to withstand attack in this injunction proceeding, the decision must be free of abuse in the exercise of KPL's discretionary power. To be free of such abuse, the decision of KPL must be based upon a reasonable probability that the construction and operation of this energy center will comply with all applicable standards and meet the requirements for the issuance of all necessary permits, state and federal.

The burden of proof in this injunction action is upon the appellants to sustain the allegations in their petition. The appellants must show by their evidence that the decision of KPL was not based upon a reasonable probability that the construction and operation of this energy center will comply with all applicable standards and meet the requirements for the issuance of all necessary permits, state and federal.

We think the proper rule is indicated in *State ex rel. Harlan v. Centralia Etc. Co.*, 42 Wash. 632, 85 Pac. 344 (1906). There a public utility had as its primary purpose the construction and operation of an electric street railway in and between the cities of Chehalis and Centralia. For the purpose of generating the necessary electric current to operate the railway, the company sought to condemn land in order to erect a dam across a river. Action was brought by a landowner to halt the condemnation, for the alleged reason that:

". . . [T]he respondent has not proceeded far enough with its scheme to demonstrate that it will be permitted to construct and operate its proposed railways, since it was made to appear by the evidence that it had not procured franchises from the cities of Centralia and Chehalis permitting it to construct its proposed railways within their boundaries, nor a complete right of way between the two cities. . . ." (p. 637.)

The court in denying the relief sought by the landowner, stated:

"It seems to us that the respondent had proceeded far enough to show that its immediate purpose was to apply the power it sought to create by the appropriation of the relator's property to a public use. This was its declared purpose, and its acts, in so far as it had actually proceeded, pointed to that end. Moreover, it is manifest that an enterprise of this character cannot be completed all at once. Being made up of several parts, it must be completed in parts. Why, then, should one part be deemed of more importance than another? Why may not the city as well say that it will not grant the franchise until the respondent has procured the power, as the court may say that it will not grant the right to procure the power until the franchise is granted? If the city did so say it, the court should hold with the relator, it is plain that the enterprise has reached a point beyond which it cannot proceed. But we think there is no reason for such a holding. We think that, when it is made to appear that a promoter of an enterprise of this kind is proceeding diligently with it, *and nothing is shown to have occurred that will prevent its ultimate accomplishment,* that the court ought not to deny the right to acquire by condemntaion an essential part merely because there is a possibility that the enterprise cannot be carried to completion. There is no danger that the property condemned will be applied to uses foreign to the purposes for which it is condemned. The property does not become the private property of the condemning corporation in the sense that it can appropriate it to uses of a private nature. It must use it for the purpose for which it condemns it, or else submit to its reversion at the suit of the state. *People v. Pittsburg R. Co.,* 53 Cal. 694; 2 Lewis, Eminent Domain, § 594, *et seq.*" (Emphasis added.) (p. 638.)

Another case in point is *Sellors v. Concord,* 329 Mass. 259, 107 N. E. 2d 784 (1952). There the Supreme Court of Massachusetts had before it a case in which the city condemned two tracts of land for a fire station and a town office. The tracts were not zoned for that purpose, and under Massachusetts rule, the change of the use of that property required the approval of a certain board of appeals. The owner of the property sought to set aside the condemnation because, in the absence of authority to construct the buildings at the time of the condemnation, the city had no right to take the land, and that,

". . . It could not, it is argued, take the land merely in the hope or expectation that at some indefinite time in the future it might be authorized to use it for the purposes for which it was acquired; the validity of the takings must be tested by the conditions obtaining at the time they were made." (p. 261.)

The court refused to stop the condemnation and return the land to the owner, stating, with respect to the owner's contention:

". . . That a possibility exists that the land may not be devoted to the proposed uses cannot be denied. But *in the absence of evidence that the town cannot reasonably expect to achieve its public purposes,* we cannot deny its

right to take land by eminent domain. Obviously in the carrying out of the projects contemplated by the town many steps must be taken, and they cannot all be taken at once. The town would hardly be in a position to ask the board of appeals for permission to use the land for municipal purposes before it had acquired the land. It would have to appropriate funds for the construction of the proposed buildings. And, conceivably, it might have to borrow money and issue bonds for this purpose. Very likely the services of an architect would be required and authority to employ him would be necessary. Perhaps building permits would also be required. It is possible, therefore, that the proposed buildings might never be built because of the failure of the town to obtain or grant authority with respect to one or more of these matters. But it would be unreasonable to hold that the town could not exercise the power of eminent domain until all steps necessary to the carrying out of the projects had been taken. . . ." (Emphasis added.) (pp. 262, 263.)

After the appellants had presented all their evidence in this action, KPL's motion for a directed verdict was denied by the trial court. Assuming KPL's motion was intended and considered by the trial court as a motion for involuntary dismissal at the close of the plaintiffs' evidence, as authorized by K. S. A. 1973 Supp. 60-241 (*b*), the trial court did not as the trier of the facts then determine the facts and render judgment against the plaintiffs, but declined to render any judgment until the close of all the evidence. KPL then proceeded to present evidence in defense to establish that its decision was free of abuse in the exercise of its discretionary power—that its decision was based upon a reasonable probability that the construction and operation of this energy center will comply with all applicable standards and meet the requirements for the issuance of all necessary permits, state and federal.

Assuming the decision of the trial court denying KPL's motion for a directed verdict was equivalent to a ruling that the appellants had made out a *prima facie* case, KPL in rebutting the *prima facie* case by the evidence it presented in defense was successful in persuading the trial court that it had not abused the exercise of its discretionary power in making its decision.

KPL's evidence that its decision was based upon a reasonable probability that the construction and operation of this energy center will comply with all applicable standards and meet the requirements for the issuance of all necessary permits, state and federal, could only come from opinion testimony of expert witnesses who had experience in the field. At the trial KPL in defense did introduce such expert opinion testimony, based upon knowledge of present problems which must be solved and past and present experience in solving them.

Substantial competent evidence was presented by KPL through Mr. Riley Woodson, a professional engineer, that KPL would be able to obtain necessary federal and state permits and approvals and comply with federal and state law. Mr. Woodson testified that as head of the power division of the engineering firm of Black & Veatch in Kansas City, Missouri, (which division has about 900 employees) he had the responsible charge for all phases of engineering work for some 15 to 20 million kilowatts of generating capacity, constituting from 50 to 100 electric generating plants. As a result, he has had experience in working with various federal and state agencies and meeting their standards (including the Corps of Engineers, the Environmental Protection Agency, and the Atomic Energy Commission). He has had experience in the use of river water and well water for cooling, in the design and operation of plants utilizing a "zero discharge" system, in the use of fossil and nuclear fuels, in the solution of problems with respect to stack gas emissions and control of ambient air quality, in the solution of problems with respect to a choice between various fuels for generating plants, in general environmental considerations, in the factors which go into site selection, in the use and reliability of scrubber systems, etc. He testified that environmental reports, leading up to environmental impact studies required under federal law, have been prepared by the power division of Black & Veatch for coal burning plants, nuclear plants, plants which utilize river water, plants which utilize well water, plants which discharge wastes into rivers, plants which have zero waste discharge, plants which use stack scrubbing equipment, plants which do not, etc. This is a brief recital of the experience of Black & Veatch of Kansas City, employed by KPL as consulting engineers for both planning and construction of the energy center.

After reciting this experience, and thus establishing himself as an expert in the field, Mr. Woodson testified that, in his opinion, water for the first two units of the proposed plant is available from wells; that the facility can be built with "zero discharge"; that the energy center will be constructed so as to meet and comply with federal stack gas emission standards and federal ambient air standards; and finally, Mr. Woodson testified that he had no doubt that KPL can obtain the necessary federal and state permits to operate the plant.

The trial court heard other evidence and had various exhibits introduced in evidence showing the results of studies made in con-

templation of the construction and operation of the proposed energy center.

We have carefully reviewed the record and determined that there is substantial competent evidence to support the findings made by the trial court.

It is the province of the trier of facts, not of this court, to pass upon the credibility of witnesses and the weight of their testimony. Our function on appeal as a reviewing court is to determine whether or not there is substantial, competent evidence to support the findings of the trial court. In making such determination, the record is examined in the light most favorable to the prevailing party below, and when the findings are based upon substantial, competent evidence, they are binding and conclusive on appeal, notwithstanding there may be evidence that would have supported contrary findings. (*Sullivan v. Sullivan*, 196 Kan. 705, 413 P. 2d 988.)

The appellants have claimed that KPL will violate the air quality standards. On this subject both sides produced testimony. The federal and state air quality standards pertaining to KPL's proposed plant might be summarized by stating they limit the concentration of certain substances at certain specified locations in the air, and they limit the restriction of visibility. The substances whose concentrations are controlled are three: sulfur dioxide (created when sulfur bearing coal is burned), nitrogen dioxide (created when any fuel is burned at high temperatures), and particulates (fine particles such as smoke, dust, pollen, etc.). These concentrations are controlled in two locations: at the stack which is emitting the substances, and in the ambient air—the air around us. In other words, there is a maximum allowable concentration of sulfur dioxide, nitrogen dioxide, and particulates which may be in the gases emitted from a smokestack and there is a maximum concentration of those substances which a plant may contribute to the concentration in the ambient air during certain time periods. As to KPL's ability to meet air quality standards the findings of the trial court are supported by substantial, competent evidence.

A primary complaint made by the appellants is that with respect to particulates KPL will significantly increase the concentration in the ambient air in 1978, and thus will violate a regulation concerning deterioration of air quality. Since there is no regulation which controls, or permits, or even defines, significant deterioration of air quality, and since there is no way for this court to predict when in

the future such a definition might be made and what the definition might be, the appellants' argument concerning deterioration of air quality is not impressive. Here again the trial court's findings are supported by the evidence.

The trial court's finding that KPL will need an additional 1,200 acres for its first unit, will need a total of 12,800 acres for the entire energy center, and will not exercise its power of eminent domain until it needs land in the reasonably near future are not only supported by substantial, competent evidence, but are uncontroverted.

There is no issue on this appeal that the 800 acres sought to be taken by the eminent domain proceeding involved in this lawsuit was necessary for unit No. 1 of the proposed energy center. The appellants stipulated at the pretrial that the 800 acres were necessary, and the only issue which they raise by their appeal are "threatened" condemnations.

The trial court specifically found from the evidence that an additional 1,200 acres will be necessary in order for KPL to complete unit No. 1 of its proposed plant.

The trial court found that KPL will need a total of 12,800 acres for the entire energy center. That finding is supported by specific testimony. The trial court also found that KPL does not intend to exercise its right of eminent domain until such time as it needs the land for such purpose in the then reasonably near future. This finding is supported by specific testimony to this effect.

This court has recently said that in determining the extent of land needed for legitimate public purposes, it is proper to consider future demands which may reasonably be anticipated. (*Soden v. State Highway Commission*, 192 Kan. 241, 387 P. 2d 182; *Reinecker v. Board of Trustees*, 198 Kan. 715, 426 P. 2d 44; *Shelor v. Western Power & Gas Co.*, 202 Kan. 428, 449 P. 2d 591; and *Spears v. Kansas City Power & Light Co.*, 203 Kan. 520, 455 P. 2d 496.)

It follows there is no support in the record for the appellants' contention that the amount of land sought in KPL's condemnation proceeding will not be used in the near future and is excessive for presently planned needs.

The appellants, having failed to show irreparable injury, are not entitled to injunctive relief. It is a universally accepted rule that to warrant injunctive relief it must clearly appear that some act has been done, or is threatened, which will produce irreparable injury to the party seeking such relief. (43 C. J. S. Injunctions, § 23; *Brock*

*v. State Highway Commission,* 195 Kan. 361, 404 P. 2d 934; *Dill v. Excel Packing Co.,* 183 Kan. 513, 331 P. 2d 539; and see *Eastwood v. Eastwood,* 167 Kan. 471, 207 P. 2d 393.)

With respect to the Rezacs, who are the owners of the 480 acres remaining in the present condemnation suit, their land was appraised by the court appointed appraisers at $344,500.00 and such amount has been paid into the clerk of the district court by KPL. However, KPL has only a permanent easement on such land for the purposes of constructing and operating a portion of its proposed energy center on that land. If KPL does not use the land for that purpose, the Rezacs will be in a position to reclaim the full title to the property (*Matlack v. City of Wichita,* 195 Kan. 484, 407 P. 2d 510; and *Isley v. Bogart,* 338 F. 2d 33 [10th Cir. 1964].) Thus, assuming arguendo, that KPL might not be able to obtain zoning, or some future permit, or might be unable to comply with some future law or regulation, the result would be that the Rezacs would have received the fair market value of their property and, since KPL could not construct or operate the plant, the Rezacs would have a right to recover the property. (See, *State ex rel. Harlan v. Centralia Etc. Co.,* supra.)

What has been said about the Rezacs is equally true concerning the other landowner-appellants, except that with respect to these families no condemnation proceeding is immediately threatened.

The corporate appellant in this case owns no property in the area, and thus cannot possibly show any irreparable injury.

For the reasons heretofore stated the judgment of the lower court is affirmed.

### APPENDIX
### "MEMORANDUM DECISION

"This cause, an injunction action, was tried to the Court, following which each party filed briefs, suggested findings of fact and conclusions of law. The Court finds and concludes:

"1. Concerned Citizens, United, is a corporation organized and existing under the laws of the State of Kansas, and its membership includes the individual plaintiffs herein, together with certain persons owning land within the designated area, and others, the names and designation or location of whom are not in evidence. Individual plaintiffs are owners of land within the designated area with which we are here concerned.

"2. Defendant, hereafter referred to as defendant or as K. P. L., is a corporation authorized to and doing businesss under the laws of the State of Kansas holding certificates of convenience and authority as a public utility issued by the Kansas Corporation Commission. As such, it is authorized to and does

own and operation electric generating stations and appurtenances, together with transmission lines for transportation and sale of electricity to customers and consumers, and has the power of eminent domain for such purposes.

"3. In March, 1973, K. P. L. publicly announced its intention to construct an energy center, north of Belvue, Pottawatomie County, Kansas, for the generation of electricity, which center would require the acquisition of approximately 13,500 acres from other landowners. The plant, the energy center, is to consist of four (4) coal fired electric generating units and appurtenances. The announcement stated the first unit will have electric generating capacity of approximately 700,000 kilowatts, and would be completed and in service in early 1978, with the three other units to be completed in approximately two year following intervals.

"4. Following the announcement, K. P. L. wrote letters to landowners and contacted landowners within the designated area expressing a desire to purchase land. No direct immediate threat of eminent domain was made, but it was suggested that if purchase were not agreed upon, eminent domain proceedings might be required. K. P. L. has purchased almost one-half of the total land required for the entire project by negotiations and private treaty.

"5. On October 29, 1973, plaintiffs filed their 'Petition for Injunctive Relief' herein, in which they prayed that defendant be enjoined from proceeding by eminent domain and enjoined from the construction of an electric generating plant and related facilities, unless and until: a) it has obtained necessary federal and state permits; b) it has demonstrated that it can comply with relevant federal and state law; c) it has received proper zoning which will allow the land to be used for defendant's purposes; d) until it has definite plans in the reasonably near future to use the land for electric generating purposes. Further, plaintiffs pray that defendant pay the plaintiffs' attorney fees, and costs.

"6. On October 29, 1973, plaintiffs filed a 'Motion for Preliminary Injunction'. This motion has never been presented to the Court, and no request for hearing thereon has been made to the Court.

"7. On November 14, 1973, K. P. L. filed, as plaintiff, in case number 11,217 in this Court, a petition under the provisions of K. S. A. 26-501, et seq., seeking to acquire a permanent easement by eminent domain in some 800 acres of land in this area in Pottawatomie County, Kansas. In that petition K. P. L. alleged, generally, that such taking was necessary in order for K. P. L. to construct electric generating systems. In that case, landowner defendants are Clarence Rezac and Agnes Rezac, his wife, and others associated in title on land therein designated as Tracts 1 and 2, and George C. Noller and Betty J. Noller, his wife, and others associated in title on land therein designated as Tract 3. Clarence Rezac and Agnes Rezac, defendants in case number 11,217, are plaintiffs in this case.

"8. Hearing on the petition in said case number 11,217 was initially set for December 3, 1973, but has been continued to a subsequent date certain, February 1, 1974. Continuances of such hearing were granted by the Court upon application therefor by defendant landowners therein.

"9. All land within the area contemplated by K. P. L.'s energy center, including the land involved in case number 11,217, is presently zoned agricul-

tural by proper zoning authorities of Pottawatomie County, Kansas. An 'agricultural' zoning does not permit construction of an electric generating plant.

"10. K. P. L. has not requested change of zoning land in the area it now owns, nor on the land involved in case number 11,217. K. P. L. contends it does not wish to ask change of zoning on a piecemeal basis, and that it cannot ask change of zoning on land it does not own. K. P. L. has had informal discussions with the Board of County Commissioners of Pottawatomie County, Kansas and the zoning authority people of the County in this regard following the March, 1973 public announcement, but did not discuss the plant site or allied matters with the landowners concerned, nor the Board of County Commissioners, nor the zoning people prior to such public announcement.

"11. Historically, K. P. L. has experienced an annual increased demand for electricity. The past two years, the growth rate has been 8% per year. K. P. L.'s projections show the expected demand on its electric generating facilities will triple by the year 1986. Recent efforts to conserve energy are not reasonably expected to materially alter the historical and economic factors involved in projected future demand for electric power. Defendant's past projections and forecasts of future demand are shown to be quite accurate.

"12. In the time area of 1969, a survey of K. P. L.'s electric generating capacity showed the defendant would be deficient in generating capacity by the years 1976 and 1977. Lead time involved from planning stages to completion of a generating plant is 6 to 9 years.

"13. In 1970, defendant commenced planning for additional construction of plant generating capacity. Survey of their then existing plants and sites lead K. P. L. to the conclusion that additional plant unit construction was not feasible at any then existing site.

"14. It was the opinion of K. P. L. and its engineering consultant, in 1971, that by the time additional electric generating capacity could be completed, neither oil nor natural gas would be available to defendant for use as a fuel to fire such plant. The only other alternate fuels known are coal and nuclear energy. Several of K. P. L.'s existing plants now use oil and/or natural gas as fuel, and cannot feasibly be converted to the use of coal. At time of trial, it is shown that appropriate governmental agencies are urging utilities, such as defendant, to convert to the use of coal as a fuel, and urging that the use of oil and gas for fuel be avoided insofar as possible.

"15. Defendant, in 1971, employed the engineering firm of Black & Veatch of Kansas City as consulting engineers for both planning and construction. It was determined that K. P. L. would construct four coal fired generating units, of approximately 700,000 kilowatt capacity, each and that nuclear capability should be considered. At the time of the trial of this cause K. P. L. has no present intention of construction of a nuclear plant in the area; this question will be re-considered in the years ahead and a determination made when necessary.

"16. The engineering firm of Black & Veatch has a long history of experience in the planning and construction of electric generating plants; it has been involved in the construction of some 15 to 20 million kilowatt generating capacity, in some 50 to 100 units; most of its experience is in the fossil fuel field. This firm has been and is responsible for planning and construction of as many coal fired plants as any engineering firm in the United States. The

individual engineer of the Black & Veatch firm having overall charge of this project for K. P. L. has had extensive experience from the planning stage to completion of such projects; this includes, among other areas, the site selection, on-line construction, environmental matters, meeting Environmental Protection Agency regulations, regulations and requirements of authorities of the State of Kansas and of the U. S. Army Corps of Engineers, and with coal and the quality thereof.

"17. In selecting a site for such an energy center, certain factors were considered, among which are:

a) A site was sought that had a low population density, which was reasonably remote from population centers, where as low an impact as is reasonably possible is made upon the environment.

b) The center of the electric load system of K. P. L. was considered, this general area being West of Topeka, Kansas, along the Kansas River.

c) Availability of water was considered for the reason that such a plant requires large quantities of water. In this connection, topography of the site is important in that several large impoundments of water are necessary for the operation of such an energy complex.

d) Availability of a railroad connection was considered important, particularly with the Union Pacific Railroad, for the transportation of coal as fuel.

e) The site must have nuclear capability.

"18. Some 13 possible sites were initially considered, examined and then this number reduced to the 3 sites believed the most desirable in meeting all requirements. The final selection is the site north of Belvue, Kansas with which area we are now concerned.

"19. July 1, 1973, K. P. L. entered into an agreement for the purchase of coal from the Belle Air Mine located near Gillette, Wyoming. This agreement extends through year 2013 and provides for deliveries commencing the second quarter of 1977, and provides for delivery, in all, of some 220 million tons of coal. This coal will be delivered to the energy center over lines of the Union Pacific Railroad. The only adequate source of long-range supply of low sulphur coal and the most feasible and favorably situated to the energy center are the Hanna and Gillette coal fields in Wyoming. This coal is described as the 'cleanest' coal in sufficient quantity known to K. P. L. or its consultant. The coal is described as a 'low sulphur and low ash' coal.

"20. The coal contract provides that the coal supplied shall be of a weighted average quality over any 30-day period of not more than .48% sulphur content, and provides that 'off-specification coal' is coal in excess of .8% sulphur content. K. P. L. is not required to accept 'off-specification coal'. The contract further provides that the coal shall be 'substantially free from impurities such as, but not limited to, bone, slate, earth, rock, pyrite, wood, tramp metal and mine debris'.

"21. Actual analysis of the coal produced from this mine shows the low range of sulphur content of .25% and high range of .42%, and an average of .317% sulphur.

"22. Some Western coal contains trace elements, such as mercury, cadmium, arsenic, fluoride, selenium, chromium, lead, beryllium, and radioactive elements. These trace elements are hazardous to human and animal health. Information of defendant is that tests show the coal in question contains .12

parts per million mercury and 30 to 60 parts per million fluoride. No other tests for trace elements in subject coal have been performed. Tolerance level for these trace elements, if any, is not known.

"23. Two coal fired plants (not KPL) constructed under the supervision of Black & Veatch are presently burning this coal as fuel. There are a number of plants now existing using this coal as fuel, without scrubbers, and they meet all applicable emission standards.

"24. National primary ambient air quality standards have been adopted 'to protect the public welfare from any known or anticipated adverse effects.' 'Effects' includes 'effects on soils, water, crops, vegetation, man-made material, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.' The State of Kansas standards are not more strict than the National standards.

"25. All coal fired plants emit sulphur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), as well as particulates. When $SO_2$ in the air combines with water in the air, sulphuric acid is formed. When $NO_2$ in the air combines with water in the air, nitric acid is formed. This will occur, but to what extent is not known.

"26. It is self-evident that sulphuric acid and nitric acid are harmful chemical compounds.

"27. The National ambient air quality standards, coal fuel, both primary and secondary, relating to $NO_2$ is .05 ppm (parts per million) annual average. $NO_2$ emissions are controlled only in the manner of burning fuel and gasses created in such burning. Scrubbing the gas stack emissions has no effect on discharge of $NO_2$. The steam generator purchased by K. P. L. for the electric generating plant or plants in question is guaranteed by the manufacturer to meet all standards in regard to nitrogen dioxide emissions. The Environmental Protection Agency (Hereafter, EPA) standard was designed around, adopted from, the performance of this steam generator.

"28. The National ambient air quality standard, coal fuel, in parts per million, relating to sulphur dioxide is as follows:

|  | Primary | Secondary |
|---|---|---|
| 3-hour average | ... | 0.50 |
| 24-hour average | 0.140 | ... |
| Annual average | 0.030 | ... |

"29. The National ambient air quality standard, coal fuel, pertaining to particulates, expressed in micrograms per cubic meter (ug/M3) is as follows:

|  | Primary | Secondary |
|---|---|---|
| 3-hour average | ... | ... |
| 24-hour agerage | 260.0 | 150.0 |
| Annual average | 75.0 | 60.0 |

"30. $SO_2$ and particulate emissions are controlled by stack gas scrubbing systems. K. P. L. is one of the nation's pioneers in the installation and operation of wet gas stack scrubbing systems for the removal of $SO_2$ and particulates. In 1966-67 K. P. L. installed one of the early scrubber systems in its Lawrence, Kansas, plant, and defendant has had experience in this field since such time.

The EPA tested the Lawrence plant system and ambient air in the vicinity, in gathering data for adoption of its standards. The Lawrence plant is fired by coal, and has the capability of using oil and/or natural gas for fuel. Experience at the Lawrence plant with that early scrubbing system is that it is inoperable approximately 20% of the time coal is burned for fuel. There are several variations of scrubbing systems now available. On stacks of 600 feet height, to be constructed for this new energy center, several scrubbers would be added in tandem. Scrubbing systems for removal of particulates and $SO_2$ from stack gas emissions are evolving. K. P. L. has not yet committed to any one scrubbing system as of this time, but is waiting as long as possible to purchase such a system in order that it may take advantage of any improvement then available in the art.

"31. In the plant units in the energy center in question here, K. P. L. intends to use stack gas scrubber systems in tandem. Tests have shown and it is reasonable to predict that K. P. L. will remove 99.2% of the particulate and 60% of the $SO_2$ from the stack emissions.

"32. Assuming .48% sulphur content coal, assuming all 4 units of the complex are operating at 100% of capacity, tests show that the K. P. L. center will emit the following:

|  | Sulphur Dioxide (ppm) | Nitrogen Dioxide (ppm) | Particulates (ug/m3) |
|---|---|---|---|
| 3-hour average | 0.10 | 0.18 | 11.0 |
| 24-hour average | 0.039 | 0.079 | 4.6 |
| Annual Average | 0.0031 | 0.0061 | 0.36 |

Additionally, tests show, using the same assumptions, that the K. P. L. energy center would not closely approach, nor exceed, the standards expressed in pounds per million Btu.

"33. If only one plant, the first plant, is in operation, the emission rates would be accordingly reduced. If the plants are operated at less than 100% capacity, emission rates would be accordingly reduced. If the sulphur content differs from the above assumed .48%, the sulphur emissions would vary accordingly.

"34. Electricity cannot be stored, but must be generated and available upon demand. Production and consumption of a total number of kilowatt hours per year is not necessarily related to total capacity of a plant, nor to peak loads of a plant. In K. P. L.'s experience, peak loads occur during the months of July and August for 12 to 15 hours of a day. During these peak load times, the plants can be expected to approach 90% to 95% of capacity. Throughout the year, on an annual average basis, the plants can be expected to operate at 60% to 65% of capacity.

"35. Peak loads occur during July and August because of the electric power requirements of air conditioning units. Utilities advertise and promote electric heating of houses and buildings in an effort to more nearly equalize load requirements throughout the year.

"36. There is evidence produced by plaintiffs to the effect that these 4 units of this energy center, at 100% capacity, will emit 6,700 tons of particulate a year; and, other evidence is adduced relating emissions to tons per year. There are 26 billion tons of air over Pottawatomie County, Kansas. Evidence of tons

per year is meaningful only as it relates to total quantities. EPA standards are not expressed in tons per year, but rather in micrograms per cubic meter, or parts per million, or pounds per million British thermal units, or in percent, the percent relating only to opacity.

"37. There is evidence produced by plaintiffs to the effect that these 4 units, assuming 100% capacity, no scrubbing of stack gas emissions, and .5% sulphur coal, will exceed and violate the EPA ambient air quality secondary 3 hour standard for $SO_2$ emissions twice a year at a point 1 mile North of the plant, and 3 times a year at a point 2 miles NNE of the plant.

"38. There is evidence produced by plaintiffs to the effect that these 4 units, assuming 100% capacity, no scrubbing of stack gas emissions, and .7% sulphur coal, will exceed and violate the EPA ambient air quality secondary 3 hour standard for $SO_2$ emissions 15 times per year at a point 1 mile North of the plants, and 14 times per year 1 mile West of the plants, and 2 times per year at a point 2 miles East of the plants.

"39. There is no credible evidence in the case upon which the assumptions contained in paragraph 37 and 38, above, may reasonably be based.

"40. Air quality in Pottawatomie County, Kansas, is considered good. Air readings at Topeka and Atchison do not represent air quality anywhere else. Although the Northeast Kansas Region is a Priority I region, this is caused by specific readings at Topeka and Atchison. The air quality in the plant area, reasonably, is more comparable to the State testing station in the rural Auburn, Kansas, area, than any other testing station site in the Northeast Kansas Region.

"41. The phrase 'deterioration of air quality' used in the Clean Air Act has not been judicially or legislatively defined, nor defined by the EPA, nor by agencies of the State of Kansas.

"42. There is no credible evidence in the case from which the Court could find the construction and operation of the four coal fired units, as contemplated by K. P. L., would violate existing air quality standards.

"43. Prior to completion of plans to construct the subject energy center, K. P. L. did not conduct a formal, in-depth new study of the effect of the plant on human, animal, or vegetable life. Rather, as to these matters, it drew upon the general knowledge and experience of its own employees and that of its consultant.

"44. Units 1 and 2 of the energy center will require water to the extent of approximately 12 to 15,000 gallons per minute. K. P. L. plans to secure this water from wells. 25,000 gallons of water per minute will be required for all 4 units. For the last 2 units, units 3 and 4 of this energy center, K. P. L. intends to secure water from the Kansas River. K. P. L. has not applied for any permit, at this time, from the U. S. Army Corps of Engineers to put a structure in the Kansas River for this purpose, but intends to do so, when the need arises.

"45. K. P. L. intends to acquire water owned by the State of Kansas through the Milford Dam Reservoir complex, in which the State has a beneficial use of certain waters, and downstream therefrom. K. P. L. has had discussions with State officials in this regard, but as yet has not made a formal application.

"46. K. P. L.'s plans include large impoundments of water in the energy center to assure continuity of supply of needed water.

"47. K. P. L.'s plans include storage of bottom ash and fly ash in impound-

ments within the energy center area, in a manner that does not permit discharge into ground water. The plants are to be designed with zero water discharge. Black & Veatch are pioneers in the concept of zero water discharge.

"48. It is not possible to make a complete geological study of the land involved without possession of the land.

"49. K. P. L. will reasonably need the 800 acres involved in case number 11,217, above mentioned, together with land it now owns, and in addition, will reasonably need approximately 1,200 additional acres of land for the construction of Unit 1 of the energy center.

"50. K. P. L. will reasonably need a total of approximately 12,800 acres for the construction of Units 1, 2, 3, and 4 of the energy center, with all necessary appurtenances.

"51. K. P. L. does not intend to exercise its right of eminent domain until such a time as it needs the land for such purpose in the then reasonably near future.

"52. Future conditions cannot be predicted with absolute certainty; future events may require K. P. L. to alter its present plans as to number of units, method of fueling such plants, land requirements, and engineering concepts.

"53. Plaintiffs do not contend that K. P. L. has acted or is acting with bad faith or fraud. Rather, plaintiffs contend that by reason of the allegations set forth in their claims, at paragraph 5, above, that K. P. L. actions and threats of actions constitute abuse of discretion, and that change of zoning of the land involved is a condition precedent to the exercise of the rights of eminent domain on the part of K. P. L., and that K. P. L. must show a reasonable probability of being able to comply with all standards applicable, and must show a reasonable probability of being able to secure all necessary permits, including a change of zoning. Plaintiffs' claims are expressed in varying approaches in a well-reasoned, thoughtful, and well-written lengthy brief.

"54. From all the evidence, the Court finds that in the construction and operation of this energy center K. P. L. will comply with all applicable standards and meet all requirements for the issuance of all necessary permits. From all the evidence, the Court finds that the operation of this energy center will not violate existing standards, regulations or laws.

Conclusions of Law:

"1. K. P. L. has the power of eminent domain, as provided by law.

"2. The lawful corporate purposes of K. P. L. include the construction of electric generating systems.

"3. K. P. L. has reasonable discretion in determining its land requirements, and the Court cannot merely substitute its judgment for that of K. P. L. Absent a showing of fraud, bad faith, or abuse of discretion, the determination of K. P. L. as to its land requirements will not be disturbed.

"4. A total of approximately 12,800 acres of land is reasonably necessary for the construction of the energy center here involved, including the land involved in case # 11,217. If the same cannot be purchased, K. P. L. has the right to proceed by eminent domain to acquire such land when needed.

"5. Change of zoning from 'agricultural' to 'industrial' is not a condition precedent to K. P. L.'s exercise of its right of eminent domain, nor is it necessary that K. P. L. produce evidence from zoning authorities that such a change of

zoning will probably be granted. Here, K. P. L. seeks an easement, in case # 11,217, not a fee taking. To require zoning authorities to commit themselves to a course of action, in advance of application and hearings, under applicable statutes and regulations, is not contemplated by zoning law.

"6. It is not required that K. P. L. have, in hand, all permits required for operating or constructing the plant, at the time of proceeding in eminent domain to acquire land for the site.

"7. Upon a showing made that K. P. L. can and will meet all applicable air and water quality standards, it cannot be said that K. P. L. has abused its discretion.

"8. 'Non-deterioration of air quality' means reduction of quality of ambient air to a point beyond applicable established standards, until and unless a different definition has been given that phrase by proper authority. To adopt the position that this phrase means maintenance of present air quality everywhere in the United States would totally prevent the construction and operation of any new industry at any new site anywhere in the nation.

"9. It is not shown, in any respect, that the actions of K. P. L. with regard to the energy center in question constitute fraud, bad faith, or abuse of discretion.

"10. Plaintiffs' prayer for injunction is denied; judgment in all respects is entered for defendant; costs are taxed to plaintiffs. Dated and filed this 28th day of January, 1974.